# CHARLESTON.

WEEKS *v.* CHESAPEAKE & OHIO RAILWAY COMPANY.

Submitted March 10, 1909.    Decided November 29, 1910.

APPEAL AND ERROR—*Disposition of Cause—Reversal—Rendition of Judgment.*

When in an action for personal injury this Court finds that the evidence shows the plaintiff guilty of contributory negli-

gence and sets aside a verdict for him, if it clearly appear to this Court that the plaintiff cannot, in fair probability, upon a new trial show a case for recovery, and that no injustice will be done by refusing a new trial, the case will not be remanded for a new trial, and judgment will be here rendered for the defendant.

Error to Circuit Court, Kanawha County.

Action by Charles Weeks against the Chesapeake & Ohio Railway Company and others. From this judgment, defendants bring error.

*Reversed and Rendered.*

*A. M. Prichard* and *Avis & Hardy,* for Belleclare Coal Co. *Simms, Enslow, Fitzpatrick & Baker,* for Chesapeake & O. Ry. Co.

*Payne & Payne, George E. Walker,* and *Berkeley Minor, Jr.,* for defendant in error.

BRANNON, JUDGE:

Charles Weeks and John Mahoney were moving coal cars to the tipple of the mine of the Belleclare Coal Company to be there loaded, and then to the point where the coal company's siding intersected with the Chesapeake & Ohio Railroad to be hauled thence to market. Along side of this siding the railroad company owned a siding, on which it placed a freight car because in bad order. The coal cars, after being loaded at the tipple, had to pass this car. The two cars had been dropped to the junction passing the bad-order car. In dropping down a third car Weeks was somehow thrown under the coal car, and his leg and arm were broken, so that amputation of the leg was made. He sued the Belleclare Coal Company and the Chesapeake & Ohio Railway Company jointly, and recovered against them a joint judgment for six thousand dollars.

Our first question is, Was Weeks a servant of the Belleclare Coal Company? It is not claimed that he was a servant of the railroad company. Its liability is predicated upon the fact that it furnished a car with bad brakes, and placed the bad-order car on its side track too close to the coal company's siding. No one gives evidence to show his employment save himself, and his evidence is vague, inconsistent, or false and

insufficient. It is proven, not contradicted, that the manner of employing men by the coal company was, that the mine boss was furnished with slips or blanks reading:

Belleclare Coal Company.

....................190....

I can use ........................... .......

As a ....................................

............................. Mine Foreman.

O. K.

.............................General Mgr.

When a man asked for employment the mine boss must fill a blank and send it to the general superintendent, and he must O. K. it before the man was employed. No such blank was sent to the general superintendent, Prichard, in this case. Thus he never employed Weeks by the rules of the company, and he was the only person authorized. In fact, we must interpret Weeks' evidence as proving that he was employed, if at all, by Powers, the mine boss, who had no such authority. Following is his evidence on that test point:

A. "The *Superintendent* of the Belleclare Coal Company, Mr. Joe Powers, on September 13th, he came down and employed me *about the 14th,* to work at the coal mine *as coal loader in the mine.* I told him I never knowed anything about loading coal in the mines, but would try, so he told me to come on *then* and work. So I could not get the checks. Mr. Prichard did not have the checks at the house, told me he would give them to me that night.

Q. "That is Mr. Fred Prichard sitting there?

A. "Yes, sir. Said he did not have the checks then. I could go on to work and he would give me the checks *that night.* I told him yes, sir, and I went on and bought myself a shovel and a can of powder and went up to the mines to work; *no contract there until I got the checks; I never did get the checks; I never went back.* Mr. Powers, Mr. Joe Powers, *on Monday afternoon he ordered me to go to the tipple to work."* Thus, by his own evidence he had *no contract* to work, had no checks, never went to get them. Here he says Prichard employed him and promised checks, yet in another part of his evidence he says when he went to ask employment he applied "to

Mr. Joe Powers, the Superintendent of the mine." What did he
say to you? A.  "Told me to go ahead and work and he would
give me the checks that night." From the above quotation
from Weeks it seems his alleged employment was on the 14th
September, the day of the accident, and Prichard and Aldrich,
the bookkeeper, swear that Prichard was not at the mine to
be seen by Weeks, but was absent and did not return on the
train until after the accident. Taking the evidence of Weeks
himself which is uncertain, unclear, its fair meaning is, as
everybody reading all of it must say, that he never was em-
ployed by Prichard, the only man who could do so, but by the
mine boss only, and nobody claims that he had authority. Weeks
does not make out this primary demand of his case, namely,
that he was a servant of the company. He was more likely a
volunteer, I think. The appearance of the case is that he was
hoping to get employment and was helping Mahoney for the
time being as a volunteer. Not being an employee of the com-
pany, the company owed him no duty. If a conductor without
authority ask a man to help him do company work, the com-
pany owes no duty and is not liable for his injury. *Taylor* v.
*B. & O. R. Co.,* 108 Va. 817. See *Muse* v. *Stern,* 82 Va. 33.
It may be that Powers did request Weeks to help move the cars;
but it is clear that Powers had no authority, as the evidence
is that he was a mine boss, his duties being inside the mine,
and that he had no authority as to moving the cars, but that the
work outside the mines was exclusively under the direction of
Prichard. This is undisputed. Powers' evidence is not in the
case to substantiate Weeks' statement that Powers employed
him. Prichard swears that he never saw Weeks until shortly
after the accident, that Weeks never asked him for employment,
and he never employed him, never had any interview with
Weeks touching it. Aldrich, the bookkeeper, says that on the
day of the accident about noon Weeks came to the company's
office and remarked that he expected to go to work, and Aldrich
asked him at what and he replied, "Loading coal." He asked
him where, he said, "At Belleclare." He said inside the mine.
Aldrich says that a little later Weeks came in again, and there
was some mention made of checks, and that he told Weeks that
it would be necessary for him to wait until Prichard's return
before getting the checks so he would be able to load coal, and

that he told him Prichard was absent. Weeks does not deny this. Now, on all this evidence, on the uncertain and contradictory evidence of Weeks, and the definite evidence of Prichard and Aldrich, there is no fair conclusion but that Prichard did not employ Weeks, and that if he was colorably employed by any person it was by Powers, utterly without authority. It is proven that only Prichard had the power to employ and Powers and Mahoney none. This is not contested. Mahoney was a mere laborer. But it is not claimed that he employed Weeks. If there was any employment it was by Powers and Powers' evidence is not taken to prove it. Not being in the service of the company Weeks cannot recover for that all sufficient reason. Speaking for myself I am of opinion that it is not proven that the coal company assumed the obligation of a master, and I give this as one reason for our decision.

But there is another ample reason against recovery, in which all five members of the Court concur. Weeks was guilty of gross contributory negligence. If blame can be attached to either of the defendants because that bad-order car standing on one of the sidings was too close to the other, Weeks, a man of thirty-one years of age, saw it and knew its place, knew its close proximity to the other siding; he and Mahoney had dropped two cars past this standing car, and Weeks was on the side of the coal car next to the standing car. How could he help seeing that standing car when it was so close that it is alleged that Weeks came in collision with it as he passed its side? And yet Weeks boldly tells us that he did not see that car. There was not the slightest thing in the way of his seeing it, only a few feet away. But in addition, Mahoney, who was helping to drop the car down said to Weeks when the second car had passed, "That's pretty close." Thus he had warning by his own eyes and by Mahoney, his own witness, of the proximity of that standing car.

Weeks' work in dropping the cars was to chuck them if going too fast. Instead of walking by the cars a little ahead so as to chuck them the better, he put his knees in the stirrup or step, thus letting his legs project, holding onto the car rod above with his right hand, a very dangerous position. Of course, his legs projecting might come in contact with the standing car. Common sense would tell him of the danger,

if in truth the accident thus happened. He had ridden thus on the two cars that had passed safely. I remark that it is somewhat difficult to see why the third car did not pass safely. While in this dangerous position Weeks had six heavy pieces of oak timber for chucking, three feet long, six inches thick and a foot wide, on the bumper of the car to be handled with his left hand in chucking, whilst he was right handed. It would be almost utterly impossible to chuck from that position. That he could with his left hand successfully and safely handle those heavy pieces of timber and place them on the track from his perch. Was it not extremely dangerous leaning to place those heavy pieces? There was another safe way as proven by an experienced man in this case, without contradiction, if proof is necessary, and that was to walk by the car, a little ahead of it, and put the chuck under the wheels. We find in 9 Enc. Dig. Va. & W. Va. 714, the following: "It is a well settled principle, that where a person has a choice of two ways of performing his duty, one of which is perfectly safe, and the other dangerous, and he voluntarily chooses the latter and is injured, he is guilty of contributory negligence, and the master is not liable."

What is the complaint of the plaintiff? One is that the standing car was too close. Why did he project his legs, if he took that position on the step? Why did he not stand on the step where he would have been safe from contact with the standing car? He himself says that Mahoney, who was directing the movement of the car, and was experienced, told him to stand, but he says, "Of course, I didn't stand, I got in the step and kneeled down on the step." He put his knee in the step, he says. He thus disobeyed orders to take a place of safety and chose a dangerous one.

Another complaint is that the brake on this car was unsafe. He knew this if it was a fact, because Mahoney swears that when they came to move this third car Mahoney told Weeks that the brakes were defective "and for him to be careful with his chucks; that he would try to drop that car to show that we weren't afraid to handle it." Thus both Weeks and Mahoney took that risk in the face of this danger. It is suggested that the brake broke. Mahoney does not say so. Weeks does not say so. Mahoney says, "So when we got it loaded and started

it down away from the tipple I set the brake as tight as I could, and I found it was gaining speed, and I yelled to him to check it and kept on calling to him." Nowhere is there positive proof that the brake or brake chain broke. There is no proof of this material fact. Moreover, Weeks says that Mahoney *exclaimed* to him that the brake was broken, and that this was twenty steps before reaching the standing car. Why did Weeks not get off or stand up in the step so as to be safe? To show the great negligence of Weeks, he said he had no occasion to look out for that standing car or to see it. Why not? He could not help seeing it and it was his highest duty, if it was close, to watch it and not to project his legs out so as to strike it. So Weeks has shown great negligence contributing to his injury.

As an instruction to find for the defendants was refused, I would sustain it and give judgment for defendants. *Ketterman* v. *Railroad,* 48 W. Va. 606; *Cobb* v. *Glenn,* 57 *Id.* 49. But three of the five members of the Court hold that as the evidence of Weeks himself and of other evidence adduced by him fixes upon him contributory negligence, it fairly and clearly appears that no different case such as to call for recovery can be made on a new trial; that to do so Weeks would have to recall and deny that evidence. We do not think a refusal of a new trial would do injustice. We think this holding is not contrary to the principle of *Sowards* v. *Car Company,* 66 W. Va. 266, or cases there cited, or *Hoylman* v. *Railroad,* 65 *Id.* 264. It ends litigation after a full, fair trial. We think the rule as put in those cases warrants us.

Therefore, we reverse the judgment, set aside the verdict, and render judgment that the plaintiff take nothing by his suit.

*Reversed and Rendered.*

ROBINSON, PRESIDENT:

It was for the jury to say, in consideration of the conflict of evidence on the point, whether or not Weeks was employed.

The testimony convicts Weeks of contributory negligence, and the court should have directed a verdict for the defendants, as requested. Only this part of the decision meets my approval.

The judgment should be reversed, the verdict set aside and a new trial awarded. Recently, in *Sowards* v. *American Car & Foundry Co.,* 66 W. Va. 266, after the fullest discussion and

consideration, we held such course proper in cases of the character of this one, and standing as it does. Why reverse ourselves so soon?

POFFENBARGER, JUDGE, *(dissenting in part):*

I am unable to concur in so much of the order, entered here, as refuses a new trial and renders judgment for the defendant. The general principle for which I contended in *Ruffner Bros.* v. *Duchess Ins. Co.,* 59 W. Va. 432, after a period of uncertainty, was finally adopted and agreed upon by a majority of the Court in *Soward* v. *American Car Co.,* 66 W. Va. 266, and I supposed it was not to be reopened or disturbed. The course, indicated in the *Ruffner Bros. Case,* had been followed in *Kuykendall* v. *Fisher,* 61 W. Va. 87, and *Hoylman* v. *Railroad Co.,* 65 W. Va. 264, cases turning altogether upon oral testimony, such as we have in this case, and the evidence in which was just as unlikely ever to be changed as the evidence here. The *Fisher* and *Hoylman Cases,* on the theory of interpretation, virtually overruled the majority view, applied in the *Ruffner Bros. Case* and the decision in *Anderson* v. *Tug River C. & C. Co.,* 59 W. Va. 301. In the *Hoylman Case,* the attention of the Court went directly to the question and the principle contended for in the *Ruffner Bros. Case* was fully and deliberately adopted and applied. In point 3 of the syllabus, we said: "The circuit court, if asked, (in a case in which the evidence will not sustain a verdict), should direct a verdict for the defendant, and if it refuses, the appellate court will reverse the judgment and verdict, and remand the case for a new trial, *unless this Court can see clearly that the plaintiff cannot make a better case upon another trial."* This was re-affirmed and applied in the *Sowards Case.* The present case cannot be distinguished from these two on the theory of a difference in the character of the evidence. It was oral in all three. The same evidence on a new trial would bring a like result. No verdict could stand on it. But how can anybody see that the evidence will not be different, stronger and better on the new trial? It has been suggested that, to make it so, the witnesses would have to alter their testimony and so lay themselves open to contradiction; but, if they did, on what principle could their altered evidence be excluded? The question of veracity is for

the jury always, and is certainly not one for the court, and most assuredly not one for anticipation and decision without hearing by the court. I do not see how anybody can say that a witness cannot change his testimony, under any circumstances, without committing perjury. Memory is treacherous with the best of us. A witness, changing his testimony, might be sustained in it by an explanation, showing his former statements were erroneous, not wilfully false, and by the testimony of additional witnesses, satisfying a jury beyond the shadow of doubt that the altered statement is the true one. How can we say this would not happen in this or any other similar case on a new trial? How can we clearly see that it would not? Nor can I see that it makes any difference, that the testimony of the plaintiff himself would have to be different on the new trial. His testimony stands on about the same footing as that of other witnesses. Thus it seems to me that to say we can see that no better showing can be made on a new trial, in such a case as this, is a mere bald assumption of something the Court cannot know. And, to my mind, this rule of practice is gravely dangerous to the rights of litigants. Suppose it should destroy one good case out of a hundred. It is better that ninety-nine guilty men should escape than that one innocent man should suffer; but, under the old settled practice for which I contend, nobody could be hurt. No unjust verdict could be sustained, and yet no good case could be destroyed. By the new rule, it is possible for any number of instances of injustice to result, without any waiver of right by the injured party, as in the case of a joinder in a demurrer to evidence.

Moreover, this drastic and dangerous practice finds no justification in the supposed policy or expediency of bringing litigation to a close, as a means of saving the time and expense of courts and juries, or shielding the defendant from annoyance. There is no recorded instance of a new trial, actually had, on the insufficient evidence used in a former trial, and nothing more. A plaintiff in that situation never takes or claims the time of the court or a jury in a new trial. Seeing for himself that he can make no better case, he never avails himself of his right to the new trial. Hence the benefit to be conferred by this radical departure is purely imaginary. It can help nobody and may utterly ruin some litigants.