THE KOBLEGARD COMPANY *v.* FRANKLIN PORTER MAXWELL

(No. 9586)

Submitted April 24, 1945. Decided May 15, 1945.

632

Robinson & Stump, John S. Stump and Myron B. Hymes, for plaintiff in error.

E. L. Maxwell, H. Roy Waugh, D. H. Hill Arnold and Arnold & Crawford, for defendant in error.

RILEY, JUDGE:

The Koblegard Company instituted this action in assumpsit in the Circuit Court of Upshur County against Franklin Porter Maxwell upon a negotiable promissory note, dated January 1, 1932, for $10,000.00, payable four months after date, and signed on the face thereof by Wm. Post, Annie Post, John Post, and the defendant whose signature appears "F. P. Maxwell, Sec.". Plaintiff prosecutes this writ of error to a judgment in defendant's favor entered upon a directed verdict.

Defendant claims he signed the note as surety and was discharged by certain actions of plaintiff, while plaintiff claims defendant was an accommodation maker and was bound to pay the note in any event and, if the relationship of surety existed, plaintiff did nothing to effect a discharge.

In 1926 William Post conveyed to Pecks Run Coal Company 449.12 acres of land in Upshur County, West Virginia, by deed in which grantor retained a vendor's lien securing

nine negotiable promissory notes payable to Post's order on or before one to nine years from date, respectively, each in the principal sum of $15,243.55 5/9, with interest payable ·annually. The Coal Company paid the note payable on or before one year from date at the maturity thereof. The note payable on or before nine years from date was assigned by Post to The Traders National Bank of Buckhannon to secure certain indebtedness which Post then owed the Bank, and the note payable on or before two years from date Post was assigned to plaintiff as collateral upon four notes all payable to the latter and held by it: (1) The note upon which this action is based; (2) a $5,000.00 note, dated January 5, 1932, signed on the face thereof by William Post, Annie Post, John Post, and the defendant as "F. P. Maxwell, Secy"; (3) a note for $3,000.00, dated January 31, 1932, signed on the face thereof "William Post, Annie H. Post, J. H. Post and Adam Post, Security"; and (4) a note for $1,000.00, dated January 25, 1932, signed on the face thereof by "William Post, Annie H. Post, J. H. Post and Adam Post, Security."

A controversy arose as to which of the two Pecks Run Coal Company's notes assigned to plaintiff and Traders National Bank had been assigned first. Plaintiff and the Bank agreed, as evidenced by an indorsement on the back of the latter's note that the said note was subordinate "in lien" to plaintiff's note "provided said Koblegard or Koblegard and Company shall not disturb the William Post Trust". By the "William Post Trust", the parties meant a deed of trust dated May 25, 1932, from William Post and wife to H. Roy Waugh, Trustee, conveying numerous tracts of land, not including the 449.12-acre tract, and securing a large indebtedness due in various amounts to many debtors. This indebtedness was never paid in full, but thirty-two per cent thereof was paid from the estate in bankruptcy of William Post, who filed a petition in bankruptcy shortly after the four months period following the recordation of this deed of trust. Post's creditors, who were not secured by this deed of trust, received nothing. The Waugh deed of trust was made at the request

of Traders National Bank, which was closed some time during 1932.

By a deed of trust, dated December 23, 1932, Pecks Run Coal Company conveyed to John S. Stump, Jr., Trustee, the 449.12 acres previously conveyed to it by William Post, subject to minor exceptions, to secure the eight unpaid vendor's lien notes in the following order of priority: (1) The Koblegard note; (2) the note held by the receiver of Traders National Bank; and (3) the remaining six vendor's lien notes. This deed of trust was made subject to the vendor's lien retained in the William Post deed, and provided for payment by Pecks Run Coal Company to the Trustee of certain monthly minimum amounts, as well as a stated sum for each ton of coal mined and removed, upon a sliding scale price with reference to the price for which the coal sold.

This deed contains the following provision: "The lien of this indenture is in addition to, and not in lieu of, the said vendor's lien [the lien retained in the deed of William Post and wife to Pecks Run Coal Company] and nothing herein contained shall be construed in any manner to alter, vary, diminish or impair the rights created by the reservation in said deed of said lien."

Under the Stump deed of trust the Coal Company paid to the Trustee a total amount of $23,409.36, from which the Trustee paid plaintiff a sum sufficient, when applied by it to the indebtedness secured by the Pecks Run Coal Company note, payable on or before two years from date, to pay in full, with interest, the $1,000.00, $3,000.00, and $5,000.00 notes and the following sums upon the note upon which this action is based: August 24, 1935, $622.48; July 10, 1936, $1,300.00; May 19, 1937, $3,400.00. Plaintiff made these payments on the four notes. In addition to these payments the sum of $5,254.85 was paid on February 14, 1941, on the $10,000.00 note from funds derived from the sale of the lands securing the vendor's lien retained in the deed of Post to the Coal Company, which sale was made on February 7, 1941, under a decree of the Circuit Court of Upshur County in the chancery suit of Central National Bank of Buckhannon against Pecks Run Coal

.Company. The payments made by Stump, Trustee, together with the proceeds of sale in the vendor's lien suit paid in full the Pecks Run Coal Company note held by plaintiff as collateral for the four notes, and reduced the instant note to the sum of $4,180.39 as of February 14, 1941.

During 1933 plaintiff sold at public sale to Hurst H. Koblegard, then one of plaintiff's directors, for $100.00 the six vendor's lien notes which were third in priority to those held by plaintiff and the receiver of Traders National Bank. This sale was attended by F. E. Williams, president of Pecks Run Coal Company, and Koblegard. Prior to this sale, Williams had agreed with Koblegard not to bid until the bidding on the notes reached the sum of $3,000.00, and plaintiff agreed to protect the note against use for nuisance purposes by bidding up to $3,000.00, if necessary. Before the sale Williams had deposited $1,820.-00 in escrow with Merchants National Bank, upon condition that the money be returned to him, if the notes were sold to someone other than plaintiff for $3,000.00 or more, but, the condition not having been fulfilled, the money was paid to Stump, Trustee, and became a part of the funds paid on the Pecks Run Coal Company notes.

On October 30, 1933, the Coal Company conveyed to Hurst H. Koblegard the 449.12-acre tract of land, excepting the coal and mining rights and certain small outsales, and subject to the vendor's lien retained in the William Post deed and the Coal Company-Stump deed of trust.

From the time Koblegard acquired title under the Coal Company's deed until the property was sold on February 7, 1941, in the vendor's lien suit, Koblegard paid taxes on the land (excluding the coal), and received $1,200.00 from the sale of timber, eight or nine thousand board feet of lumber, and a note, the amount of which is not stated in the record, and John H. Post was in actual possession of the land in consideration of "cleaning up the land for the rental." Two days after he acquired title under the Coal Company's deed, Koblegard received from Stump $1,795.48, as interest on the six Pecks Run Coal Company notes, payable on or before three, four, five, six, seven and eight years after date.

Some time between 1933 and the institution of this suit defendant filed a voluntary petition in bankruptcy. Plaintiff filed a proof of claim in the bankruptcy proceeding, in which it asserted that the only security held by it for the debt represented by the $5,000.00 note and the $10,-000.00 note was, "A Vendor's lien note of Pecks Run Coal Co. payable to Wm. Post and assigned by said Post as collateral." The proceeding was dismissed upon defendant's motion and nothing was paid to the plaintiff on the $10,-000.00 note out of the bankrupt's estate.

At the trial Hurst H. Koblegard testified on cross-examination that he was a director of plaintiff corporation at the time the instant note was given; that he knew of the note at that time; and that as one of plaintiff's officers he understood that the letters "Sec." appearing after defendant's signature to the note meant "Security".

During all of the foregoing transactions P. H. Koblegard was plaintiff's president, Hurst H. Koblegard, his son, was plaintiff's vice president and one of its directors, William Post was P. H. Koblegard's brother-in-law, Annie H. Post was William Post's wife and a sister of Mrs. P. H. Koblegard, John H. Post was William and Annie H. Post's son, and William Post, according to defendant's testimony "was my uncle by marriage."

Initially, the question presented by this record is whether defendant was a surety or an accommodation maker. If he was a surety, his actions must be considered to determine whether in law they effected defendant's discharge either *in toto* or *pro tanto*.

As heretofore stated, defendant signed the note on the face thereof without having received any compensation therefor. The letters "Sec." appearing after defendant's name on the note are to some extent indicative that the relation of principal and surety existed between defendant and the other signers. Hurst H. Koblegard, plaintiff's vice president and one of its directors, testified that he knew of the $10,000.00 note at the time of its execution and of the letters "Sec." appearing after defendant's signature, and at that time he understood the letters to mean

"Security". This evidence clearly establishes that defendant was a surety and not, as plaintiff claims, an accommodation co-maker of the note, provided such relationship applies to a negotiable instrument. In this jurisdiction parol evidence is admissible to prove the relation of suretyship between the parties to a written contract. *Parsons* v. *Harold*, 46 W. Va. 122, 32 S. E. 1002; *Creigh* v. *Hedrick*, 5 W. Va. 140. See generally 8 Am. Jur., Suretyship, Section 1106.

Basing further consideration of this case upon the foregoing premise, the next question presented by this record is whether the law of principal and surety applies to a negotiable instrument. The Negotiable Instruments Law, Code, 46-8-1, provides for the manner in which a negotiable instrument may be discharged. Section 2 provides when a party to a negotiable instrument is discharged. The four instances contained in Section 1 which would effect the discharge of a negotiable instrument do not apply to a surety. It is to be noted that the words "person primarily liable" are used in lieu of the words "principal debtor", used in Code, 1923, 98A, 119, in order, according to the revisers' note "to eliminate questions of suretyship, leaving them to be dealt with as at common law". Code, 46-8-2, specifies when a party to a negotiable instrument is to be discharged: " (a) By an act which discharges the instrument; (b) By the intentional cancellation of his signature by the holder; (c) By a valid tender of payment made by a prior party. (d) This section does not include the rules governing the discharge of a surety or a party secondarily liable because of such secondary liability." Following the suggestion contained in the revisers' note to this section of the Code, subsections 5 and 6 of Section 120, Chapter 98A, Code, 1932, were deleted because they embrace only certain doctrines of suretyship while "other equally important" rules of suretyship were not codified. From the revisers' notes to both sections of the 1931 Code, we think they intended, as in our opinion the statute actually does, to take wholly from the operation of the Negotiable Instruments Law, the entire law of suretyship.

The deletion of subsections 5 and 6 of Section 120, Chapter 98A, Code, 1923, from the statutory law of this State by the enactment of Code, 1931, and the substitution of the words "person primarily liable" for "principal debtor" in Code, 46-8-1, together with the substitution of the words "a party" in Section 2 in lieu of the words "person secondarily liable" used in Section 120, Article VIII, Chapter 98A, Code, 1923, in our opinion evidence a clear legislative intent to make the relation of principal and surety as it existed at common law applicable to negotiable instruments. This position is consonant with the revisers' notes to said Section 1 and 2 of the 1931 Code. In view of the change in our statute the position of plaintiff's counsel, assumed in reliance upon the cases in the annotations to the cases of *Vernon Center State Bank* v. *Mengelsen,* 166 Minn. 472, 208 N. W. 186, 48 A. L. R. 710, and *Peter* v. *Finzer,* 116 Neb. 380, 217 N. W. 612, 65 A. L. R. 1419, is untenable. So far as the immediate question is concerned, cases dealing with a statute identical with our statute before the amendment are to be distinguished from the instant case. For instance the facts in the case of *Harrison* v. *Cravens,* 25 Tenn. App. 215, 155 S. W. 2d 873, cited by defendant's counsel, are substantially identical with the facts of the instant record. There two of the defendants signed the note upon which the action was based with the qualification "Sec." and "surety" after their respective names. The payee knew that they had signed only for the accommodation of the maker. The Tennessee Court reversed the trial court in dismissing the action as to the accommodating defendants, and entered judgment in plaintiff's favor. But the Tennessee statute, so far as it dealt with the question we have immediately before us, was identical with Sections 119 and 120, Article VIII, Chapter 98A of Code, 1923. The case of *Marshall County Bank* v. *Fonner,* 113 W. Va. 451, 168 S. E. 875, cited by plaintiff's counsel in support of its theory that defendant is an accommodation party within the meaning of Code, 46-2-6, may be distinguished from the case at bar. In that case there was no qualification to the signatures of the alleged accommodation makers, and from the statement of facts it appears that at the time the

note was delivered to plaintiff, he knew that the accommodating parties were accommodation makers, which precludes any idea that they were gratuitous sureties. We disapprove such parts of that opinion as would indicate that the law of suretyship where the relation of principal and surety in shown under proper evidence does not apply to a negotiable instrument. We are of the opinion that the defendant is a gratuitous surety within the meaning of the general law of surety, as it existed prior to the enactment of Chapter 98A, Code, 1923, and not an accommodation party, as defined by Code, 1931, 46-2-6, and, as such, on the question whether a discharge either *in toto* or *pro tanto* was effected, the general law of suretyship should be applied in appraising his rights and liabilities.

Unlike a surety for hire an accommodation or gratuitous surety is a favorite of the law. In the application of a contract of suretyship, the rule of *strictissimi juris* applies to such surety. *Board of Commissioners of Ohio County* v. *Clemens et al.,* 85 W. Va. 11, 100 S. E. 680; *American Surety Co. of New York* v. *Commonwealth,* 180 Va. 97, 21 S. E. 2d 748; Feinsinger's Stearns' Law of Suretyship, pages 402, 403; but the rule does not apply to the construction of such contract. *L. Schreiber & Sons Co.* v. *The Miller Supply Co.,* 77 W. Va. 236, 87 S. E. 353. Any material modification of a contract with a gratuitous surety, made between the creditor and the principal, without the surety's consent, will operate to effect a discharge *in toto;* but the modification must be the result of an agreement binding on both creditor and principal. 50 Am. Jur., Suretyship, Sections 48, 49, 50 and 60. In *First National Bank of Philippi* v. *Kittle et al.,* 69 W. Va. 171, 71 S. E. 109, 37 L. R. A. (N. S.) 699, Anno. Cas. 1912B, 113, it was held, "A creditor is bound to use proper care and diligence in the management, and collection of collateral securities; and a surety will be released, to the extent of the loss actually sustained by the negligence of the creditor, to the same extent, as if such loss was due to some positive act of the creditor." And where there has been a misapplication of funds, the surety not assenting thereto, and the risk is thereby materially increased, the surety will ordinar-

ily be discharged. *E. S. Hamilton* v. *Republic Casualty Company et al.,* 102 W. Va. 32, 135 S. E. 259. But where the rights of a surety are altered by the creditor's failure to apply for the surety's benefit all moneys and securities of the principal within his control which he has the right to apply, the surety is released *pro tanto.* 50 Am. Jur., Suretyship, Section 109.

Defendant's counsel assert that if defendant is a surety and not an accommodation maker, he is discharged because, (1) plaintiff modified the contract of suretyship without defendant's consent, and committed acts detrimental to defendant; (2) plaintiff misapplied the proceeds of the $15,243.55 5/9 collateral note to payment in full of the $1,000.00, $3,000.00, and $5,000.00 notes, and to partial payment only of the instant note; and (3) the sale of the six Pecks Run Coal Company notes was void because consummated through an arrangement which was tantamount to a stifling of bids.

Defendant's first position that plaintiff modified the contract of suretyship without defendant's consent and committed acts detrimental to defendant is, to a large extent, grounded upon the Waugh deed of trust. According to plaintiff's brief William Post and wife, while insolvent, executed the deed of trust to Waugh, dated May 25, 1932, securing practically all of Post's creditors except plaintiff, and that during the four months period within which suit could be instituted to set it aside, under Code, 40-1-5, Peter Koblegard agreed by contract not to institute suit for such purpose. Defendant's counsel admit, and rightly so, that defendant would not have been released by plaintiff's non-action in the bringing of such suit. 2 Daniel on Negotiable Instruments, 6th Ed., Section 1311. At the time the Waugh deed of trust was executed, Post was greatly indebted to Traders National Bank. After a receiver was appointed for the Bank, at the receiver's request, he gave the Waugh deed of trust on the basis of which thirty-two per cent of the indebtedness secured thereby was paid out of the estate of William Post in bankruptcy.

About this time there was a real controversy between

the Bank's receiver and plaintiff as to whether the vendor's lien note held by the former was prior or subsequent to the vendor's lien note held by plaintiff. Koblegard's agreement with the receiver not to attack the Waugh deed of trust resulted in establishing priority of the Koblegard note over that held by the receiver, which, in fact, resulted in a benefit to defendant rather than a detriment. As a result the vendor's lien note held as collateral for the $10,000.00 note was paid in full, and the proceeds thereof were available toward the payment of all four notes. If such priority had not been established by agreement, the Bank's note would have had priority over the Koblegard note, or the notes would have been on a parity depending upon the solution of the controversy. In either event the Koblegard note would have been only partially paid.

There was no extension of time to the Posts on the note upon which this action is based, which would operate to effect defendant's discharge, because (1) the Stump deed of trust specifically provides that "The lien of this indenture is in addition to, and not in lieu of, the said vendor's lien, (the lien reserved in the Post-Pecks Run Coal Company deed) and nothing herein contained shall be construed in any manner to alter, vary, diminish or impair the rights created by the reservation in said deed of said lien"; (2) there was no binding agreement between the creditors and the Posts whereby plaintiff undertook to forbear enforcing the notes upon which defendant was surety; (3) the agreement and all negotiations between plaintiff and the Posts concerned matters collateral to the indebtedness sought to be collected in this action; and (4) the failure to have the Waugh deed of trust set aside did not prejudice defendant in the least. In the latter regard, the fact that no interest was paid on the vendor's lien note securing the note in question during the time it was unpaid did not, contrary to the suggestion of defendant's counsel, cause defendant to lose anything. It is true, if interest had been paid on the vendor's lien note, the principal of the notes which it secures would have borne a

proportionately like reduction in interest. Dollar for dollar the two notes were bearing a like rate of interest.

Defendant's second position that plaintiff misapplied the proceeds of the Peck Run Coal Company note held by Koblegard as collateral to the four notes it secured is not, in our opinion, sustained by the record. Neither the Posts, Pecks Run Coal Company, nor defendant made any request for a particular application of the payments to the four notes. The money paid to plaintiff by Stump was not a payment by the Posts. It consisted simply of the proceeds of a single collateral note securing indebtedness represented by the four notes, the respective due dates of which are not shown by the record. A general payment by a debtor without direction may be applied by a creditor as he may determine. Jones on Collateral Securities, 3rd Ed. 549. In the case of *Wait, Executrix* v. *Homestead Building Association,* 81 W. Va. 702, pt. 2 syl., 95 S. E. 203, this Court held: "Application of a payment once made either by direction of the debtor or in the absence of such direction by the creditor cannot be revoked except with the assent of both." And the general rule is that a creditor may, in the absence of a contrary agreement, apply the proceeds of collateral securing a series of notes to the notes he may deem to his best interests. Feinsinger's Stearns on the Law of Suretyship, 4th Ed., Section 118. Under the weight of authority, where collateral covers debts of the principal on some of which a surety is bound and on others he is not bound, a creditor may, except in the case of a special pledge for a particular debt or debts, apply the proceeds of collateral to debts on which the surety is not bound in preference to those on which he is bound. For an excellent collation of authorities see annotations to *Wait* v. *Homestead Building Association,* supra, 21 A. L. R. 696; *Salt Lake City* v. *O'Connor,* 68 Utah 233, 249 P. 810, 49 A. L. R. 941; *Madison National Bank of London, Ohio* v. *Weber, Executrix,* 117 Ohio St. 290, 158 N. E. 543, 60 A. L. R. 199. The principle permitting a creditor, in the absence of an agreement for a specific pledge to a particular debt, to apply the proceeds of collateral to the notes it secures, as he deems best, is based upon the

right of the creditor to protect himself by the payment of the debt or debts least secured. Applying this principle to a case involving debts secured by different sureties, we think a creditor may, as plaintiff has done, choose among different sureties and apply the proceeds of collateral on other than a pro rata basis.

The sale of the six vendor's lien notes to Koblegard, even if void or voidable, did not prejudice defendant. By virtue of the priority agreement between Koblegard and the Bank's receiver and under the Stump deed of trust, the vendor's lien note securing the four Koblegard notes was held in a position of priority to the other seven unpaid vendor's lien notes, and it alone was paid in full from the proceeds derived from the vendor's lien suit and the payments made under the Stump deed of trust. For the same reason the sale of a part of the timber from the 449.12-acre tract of land secured by the vendor's lien did not affect defendant's rights.

This record, in our opinion, does not disclose any action on the part of plaintiff which would effect a discharge *in toto* or *pro tanto* of defendant's liability as surety.

In conformity with an opinion of this Court filed on December 5, 1944, an order was entered reversing the judgment of the trial court, setting aside the verdict of the jury and remanding the case to the trial court for the entry of judgment in plaintiff's favor against defendant for the balance due on the principal and interest on the note on which this action is based. A rehearing was granted confined to the question whether a new trial should be awarded.

Prior to the case of *Maupin* v. *Scottish Union & National Insurance Co.*, 53 W. Va. 557, 45 S. E. 1003, it was the general rule in this State that this Court would award a new trial in a law action upon the setting aside of the verdict and reversal of the trial court. Commencing with the *Maupin* case, this Court in the cases of *Anderson* v. *Tug River Coal & Coke Co.*, 59. W. Va. 301, 53 S. E. 713; *Ruffner Brothers* v. *Duchess Insurance Co.*, 59 W. Va. 432, 53 S. E. 943; *McMillan* v. *Middle States Coal & Coke Co.*, 61 W. Va.

531, 57 S. E. 129; *Soward* v. *American Car & Foundry Co.*, 66 W. Va. 266, 66 S. E. 329; and *Weeks* v. *Chesapeake and Ohio Railway Co.*, 68 W. Va. 284, 69 S. E. 805, applied the rule that there would be no remand for a new trial unless it appears that an injustice would be done by such action. The rule announced in these cases was overruled in so far as it applied to a motion for judgment *non obstante veredicto* in *Dunbar Tire & Rubber Co.* v. *Crissey*, 92 W. Va. 419, 114 S. E. 804. This case was followed in *Zogg* v. *Kern Oil & Gas Co.*, 94 W. Va. 17, 117 S. E. 620, and *Gray* v. *Norfolk & Western Railway Co.*, 99 W. Va. 575, 130 S. E. 139. The *Zogg* case was approved in *Clise* v. *Prunty*, 112 W. Va. 181, 163 S. E. 864. Where, in an action at law, this Court, upon the reversal of a judgment of a trial court, sets aside a jury verdict on the ground that there is insufficient evidence to support the verdict, a new trial will be awarded in all cases except where there is a demurrer to the evidence. For an illuminating discussion of the question immediately under consideration see note by Professor Leo Carlin of the College of Law of West Virginia University, 28 W. Va. Law Quarterly, 218.

For the foregoing reasons the judgment of the Circuit Court is reversed, the verdict aside and a new trial awarded.

> *Judgment reversed; verdict set aside;*
> *new trial awarded.*

LOVINS, PRESIDENT, concurring:

I concur in the result, but the chameleonic rule discussed in the latter part of the opinion and carried· into the eighth point of the syllabus has undergone another change. I am in agreement that it is a general rule that where this Court sets aside a verdict returned in a law action on the ground that the evidence is insufficient to sustain it that a new trial should be granted. This general rule is established by the authorities cited in the opinion.

The eighth point of the syllabus herein permits of one exception only to such general rule: Where there is a demurrer to the evidence, judgment should be entered

here. Such exception exists. But there is an additional exception eliminated by the eighth point of the syllabus, and which is stated as follows: "When in an action * * * the evidence is such that a verdict for the plaintiff should be set aside, the circuit court, if asked, should direct a verdict for the defendant, and if it refuses, the appellate court will reverse the judgment and verdict, and remand the cause for a new trial, *unless this Court can see clearly that the plaintiff cannot better his case upon another trial.*" (Emphasis supplied.) *Hoylman* v. *Railway Company*, pt. 3, syl., 65 W. Va. 264, 64 S. E. 536. See *Ross* v. *Railway Co.*, 76 W. Va. 197, 201, 85 S. E. 180; *Butcher* v. *Sommerville*, 67 W. Va 261, 67 S. E. 726; *Soward* v. *Car Co.*, 66 W. Va. 266, 66 S. E. 329. The principle for which the *Hoylman* case is here cited as establishing a second exception to the general rule above noted has not been overruled. The holding here made is in direct conflict with that made in the *Hoylman* case. Moreover, the rule laid down in this case is so inflexible that it will tend to prolong needless litigation. It is my opinion that where it can be seen clearly that no additional facts can be shown on a second trial making a better case for the plaintiff in an action at law, this Court should enter judgment regardless of whether there has been a demurrer to the evidence in the trial court.