**BETTER HOMES, INC., a corporation,**
**Plaintiff,**

v.

**Decatur H. RODGERS, Jr., individually,**
**and Lacy I. Rice, Herbert E. Hannis,**
**Decatur H. Rodgers, Jr., and Lacy I.**
**Rice, Jr., Partners doing business un-**
**der the firm name of Rice, Hannis and**
**Rodgers, Defendants.**

**Civ. A. No. 244-M.**

United States District Court
N. D. West Virginia,
at Wheeling.
June 22, 1961.

Archibald McDougall, Martinsburg, W. Va., for plaintiff.

Clarence E. Martin, Jr. and Harry H. Byrer, Martinsburg, W. Va., for defendants.

CHARLES F. PAUL, District Judge.

This is an action brought against a lawyer, and the other members of a law firm with which he is associated, by his former client to recover damages for the negligent performance or nonperformance by the lawyer of his undertaking to file and prosecute in the Supreme Court of Appeals of West Virginia a petition for writ of error to a judgment for $13,500.00 which had been rendered against the client in the Circuit Court of Jefferson County, West Virginia.

The lawyer was local counsel for the defense of the client in an action brought in the Circuit Court of Jefferson County, West Virginia by one, Karl E. Hill, to recover damages suffered by reason of a fire which substantially damaged Hill's home, which fire was alleged to have been caused by the negligence of the client's employees while engaged in reroofing the house under a contract with the client. In the trial of the case, the defendant lawyer was associated with two other lawyers, nonresidents of West Virginia, who were in active charge of the case.

The trial in the Circuit Court resulted in a jury verdict for $13,500.00 against the defendant in that case (the plaintiff

here) on October 5, 1956. Numerous exceptions were saved to rulings of the trial court on the admission of evidence and the giving of or the failing to give instructions, and the overruling by the Circuit Court of the defendant's motion for a directed verdict. The defense lawyers moved for a new trial and their motion was argued and overruled on April 23, 1957, and a judgment order in the amount of $13,500.00 was entered.

The defendant lawyer's co-counsel requested him to take charge of the procedures necessary for appellate review, and he agreed to do so.

At the instance of the defendant lawyer, a proper bill of exceptions, signed by the Judge of the Circuit Court on July 15, 1957, and made a part of the record, and the record of the case, including a transcript of the evidence, were sent to the Clerk of the Supreme Court of Appeals of West Virginia on July 26, 1957. Under the applicable statute of the State of West Virginia, the time limit for the filing of a petition for appeal or application for writ of error is eight months from the entry of final judgment, and the rules of the Supreme Court of Appeals provide that any such petition or application must be accompanied by a memorandum of argument and authorities. The time limit for the filing of a petition or application, therefore, expired December 23, 1957. The defendant lawyer failed to file his petition for writ of error until January 13, 1958, and, when sent, it was not accompanied by the requisite memorandum of authorities and argument. As a result of the late filing, the Supreme Court of Appeals of West Virginia, on April 7, 1958, dismissed the petition for a writ of error.

The defendant lawyers, in this case, have moved for summary judgment based upon the pleadings, the facts elicited upon pre-trial conferences and hereinbefore outlined, and an affidavit by the Clerk of the Supreme Court of Appeals of West Virginia, indicating that, in a year's time, the Supreme Court of Appeals of West Virginia had granted review upon applications for appeals and writs of error in something less than one-third of the cases presented.

The defendant lawyers contend that, as a matter of law, I should find that damages claimed by the plaintiff are conjectural and impossible of ascertainment with the degree of certainty requisite to the maintenance either of an action in contract or tort; that, at the most, if this is considered contract action, the plaintiff is entitled to nominal damages only, which would not be sufficient to give this court jurisdiction in a suit based upon diversity of citizenship.

The defendants' argument runs that the plaintiff's proof of damage requires the following assumptions:

(1) That, since appellate review in West Virginia is not a matter of right, the Supreme Court of Appeals would have included the Hill v. Better Homes case among the minority of cases in which review was granted;

(2) That, on submission of the case on review, the Supreme Court of Appeals would have reversed the judgment of the lower court and remanded the case for new trial; and

(3) That, upon new trial, the verdict and judgment would have been rendered and entered for the defendant upon substantially the same evidence on which the first jury unanimously found for the plaintiff.

Defendant lawyers persuasively argue that this court cannot make the requisite assumptions and findings, and that it is apparent that the worth of the chances of successful appellate review and successful new trial to the plaintiff here at the time it was deprived of those chances by the failure of the defendant lawyer to move in time, is considerably less than the minimum amount of this court's jurisdiction.

Since a jury trial was not demanded by the parties and the case could be submitted to the court on final hearing simply by the addition to the record of the record and transcript in the Circuit

Court case, I deferred ruling upon the motion for summary judgment until final submission. The record and transcript of the trial in the Circuit Court was filed, and the case submitted, by stipulation, as upon trial to the court.

The defendants' position that I should dispose of this case by summary judgment is appealing because it is repugnant to my sense of judicial propriety that I should sit in lieu of the Supreme Court of Appeals of West Virginia, to pass judgment upon the propriety of the rulings of the trial court, which is at least co-ordinate with mine. To do so I would have to go through the two stages of the appellate procedure and decide, first, that the case is of sufficient public importance or that the possibility of error is sufficiently apparent to make appellate review imperative, and, second, that there was prejudicial error in the trial, compelling the granting of a new trial. Even more distasteful would be my embarking upon the third stage. This would require that, upon review of the evidence as set forth in the written transcript (or such parts thereof as were properly admitted), I should find that the weight of the evidence adduced before the jury which heard that evidence and saw the witnesses, was, contrary to the verdict of that jury, on the side of the defendant in the case. Fortunately, I am not faced with the necessity of deciding whether I should enter this third stage. Both in argument and on brief, counsel for the plaintiff client has admitted that "what the plaintiff here has to show in order to recover is not merely that it would have been awarded a new trial by the Supreme Court of Appeals of West Virginia the result of which might have been either for or against it, but it has to go further and satisfy this court that on a new trial the result could only have been in its favor, and no judgment could properly have been entered against it." In my opinion, this concession is justified. In my opinion, if the plaintiff client shows that his only chance of recovery here is to convince a new jury, or a judge sitting in lieu

thereof, that the weight of the evidence introduced before the first jury preponderates in favor of the defendant in that suit, then I think that it is apparent that the plaintiff client's loss was proximately caused not by the defendant lawyer's failure to take an appeal in time, but by the weakness of its own case as presented to the first jury. Damages in this event, are not merely speculative, they are nonexistent.

In this posture of the case, the "second stage" above referred to is limited to a search for error so vital that its correction would necessitate a judgment *non obstante veredicto* and the entry of a judgment for the defendant in the appellate court in those States whose procedures permit it, or a reversal of the case with clear indication to the trial court that a verdict should be directed for the defendant. The most usual case of this kind is where there is insufficient evidence to carry the case to the jury and the trial court should have directed a verdict for the defendant as a matter of law.

I have used the words "reversal of the case with clear indication to the trial court that a verdict should be directed for the defendant" because of a peculiar situation pertaining to West Virginia appellate procedure. In Koblegard Co. v. Maxwell, 1945, 127 W.Va. 630, 34 S.E.2d 116, and in other cases both prior and subsequent to the Koblegard case, the Supreme Court of Appeals of West Virginia has adopted the inhibition that it will not enter a judgment contrary to the trial court's judgment except where the case comes before it on a demurrer to the evidence, not even in a case in which it reverses the trial court on the grounds that there was insufficient evidence to support the verdict. In such case, the Supreme Court of Appeals sends the case back under a mandate which requires a new trial. However, subsequent cases have made it clear that the Supreme Court of Appeals of West Virginia, if it feels that the appellee cannot make a better case on a new trial, will so indicate to the trial court. I cannot,

believe that any trial court would disregard any such clear direction, and I am convinced that a case reversed, with such direction, would result in a directed verdict in the trial court. It will be interesting to see what the Supreme Court of Appeals may do with the ruling of the Koblegard case, now that it has promulgated rules of practice and procedure for the trial courts, similar to the federal rules, permitting trial courts to set aside verdicts and render judgments contrary thereto. It would seem incongruous for the Supreme Court of Appeals to grant this power to trial courts and preserve the inhibitions in the exercise of its own powers.

If it should be the law that the necessity of undertaking the functions of the Supreme Court of Appeals, in the limited sense hereinbefore outlined, renders the proof of damages too remote, speculative and uncertain to receive cognizance, it is apparent that no lawyer can ever be held financially responsible for admitted negligence in failing to perfect an appeal from a judgment adverse to his client. I do not believe that that is or should be the law. The integrity of the Bar as an essential part of our judicial system is too important to permit its reputation to be impugned by a justifiable charge that its members are free of an obligation to respond in damages for breach of the ordinary standards of due care, simply because the damages are difficult of ascertainment.

That the "speculative nature" of the damages is no defense to a negligent lawyer whose client has lost the opportunity to have his claim adjudicated by a court and jury because of his failure to file suit within the statutory period, or to take necessary steps properly to mature and present his suit, seems to be the majority rule. The better reasoned opinions hold that a client is entitled to his day in court and to damages, which include the value of his lost claim, even though the ascertainment of those damages involves an adjudication, in the subsequent suit between client and lawyer, of the issues which would have been tried in the first suit, had it been properly filed and prosecuted. The courts recognize the difficulties inherent in trying these issues in a suit in which the claimed debtor is not a party, and in which the evidence which he might have presented may not be available to the lawyer as defendant, but, on balancing the interests, place this burden on the defendant lawyer rather than leave the innocent client to bear the loss of his unlitigated claim. See McLellan v. Fuller, 226 Mass. 374, 115 N.E. 481; see also the authorities cited in the exhaustive note on the subject in 45 A.L.R.2d, at page 5 et seq., and an article in West Virginia Law Review, Vol. 60, No. 3, at page 225 et seq., entitled "Attorney Negligence—A Suit Within a Suit".

I have been surprised at the paucity of authoritative cases in which a losing defendant charges negligence against his lawyer for failure to take timely appeal. Counsel have cited none, and my own research has uncovered few.

In Pete v. Henderson, 1954, 124 Cal. App.2d 487, 269 P.2d 78, 79, 45 A.L.R.2d 58, the California District Court of Appeal reversed a judgment limiting damages in such a case to the amount paid the attorney for prosecuting the appeal, saying, "In the present case the attorney was negligent in failing to file the notice of appeal. That is admitted. The question is, what damages were proximately caused by that negligence? Obviously, the $150 fee paid to the attorney to take the appeal was a proper item of damage. This was allowed and is not in question on this appeal. But that is not the only item of damage that appellant may have suffered. If the judgment against him for $1660 was erroneous, to the extent that it would have been reversed on appeal *under circumstances that would not require him to pay it,* he has suffered serious damage indeed. * * * If proof of the required facts can be made, appellant should be able to recover the damage so suffered." (Emphasis supplied). A similar result seems to have been reached in the following cases: General Accident

Fire & Life Assur. Corp. v. Cosgrove, 1950, 257 Wis. 25, 42 N.W.2d 155; Kruegel v. Porter, Tex.Civ.App.1911, 136 S.W. 801; Drais v. Hogan, 1875, 50 Cal. 121; Childs v. Comstock, 1902, 69 App.Div. 160, 74 N.Y.S. 643. In other cases, the damages seem to have been limited by the court to the recovery of advances made for services and costs in prosecuting an appeal. See Cornelissen v. Ort, 132 Mich. 294, 93 N.W. 617; Laux v. Woodworth, 195 Wash. 550, 81 P.2d 531. In still another case the court limited the recovery to nominal damages (Western & Southern Life Ins. Co. v. Selzer, 44 Ohio Cir.Ct. 146).

■ Having concluded that the better reasoned cases support an award of damages in the full amount of the judgment suffered and paid by the plaintiff client where he can prove that a timely appeal would have resulted in a reversal of the judgment against him and entry of judgment in his favor as a matter of law, I overrule the defendants' motion for summary judgment.

■ By the above ruling, I have imposed upon myself the duty of reviewing the transcript of the evidence in the case of Hill v. Better Homes Inc. in the Circuit Court of Jefferson County, West Virginia, for the purpose of resolving the question of whether or not, on the evidence of that record and transcript, the plaintiff here has sustained its burden of establishing that, upon proper appeal, the verdict and judgment against it would have been reversed under circumstances which would have required a directed verdict in its favor upon retrial or the entry of judgment in its favor as a matter of law.

In the light of the evidence, I find that there are none of the rulings of the trial court, to which exceptions were saved, on the admissibility of evidence or in the exercise of his discretion in the conduct of the trial or in the giving or denial of requested instructions which, even if erroneous, constitute error the correction of which would impel a directed verdict in favor of the defendant in that trial. This leaves for consideration the question of whether the evidence was sufficient to carry the case of the plaintiff Hill to the jury, and a resolution of that question necessitates some discussion of, and findings with respect to, the evidence.

Hill's home in Shepardstown, West Virginia, was seriously damaged by fire on June 10, 1953. The fire broke out on the east side of the roof of the house, at approximately 12:30 P.M. On that day, and for some eight days prior thereto, Better Homes Inc., through its employees, was engaged in laying a new roof of asphalt shingles on the house, over tar paper which it had tacked over an old wood shingle roof, which in turn had been nailed to wooden strips some 3 or 4 inches wide, with apertures between them, across the rafters. During the entire conduct of the work, the weather had been hot and dry, and on the day of fire, the temperature was between 90° and 100°.

On several occasions during the course of the work, the plaintiff's wife had discovered evidence of cigarette smoking by the workmen on the roof, in the form of discarded butts, and had rebuked the workmen therefor. At 8:30 on the morning of the fire, plaintiff's wife had observed the roof through the windows in attic dormers, and had seen discarded cigarette butts, principally in the gutters of the roof. At 11:00 o'clock that morning, the plaintiff's wife, in her upstairs bedroom, directly under an attic dormer upon which the workmen were working, had smelled cigarette smoke. At 11:50 on that morning, she had observed from her kitchen window a workman climbing a ladder to the roof with a lighted cigarette in his mouth and shingles under his arm. The two workmen left the roof for lunch at a few minutes before 12:00 o'clock. Shortly after 12:30, while the workmen were finishing their lunch on the back porch of the house, one of them discovered smoke coming from the roof of the house. At approximately the same time, neighbors and other observers saw smoke and fire,

variously estimated "about the size of a bushel basket" and "some 8 to 10 feet in diameter", coming from the east side of the roof at some point between or near a chimney and a dormer.

Upon being apprised of the fire, plaintiff's wife rushed to the attic and found a great deal of smoke in the unfinished attic and fire observable at the roof near the chimney. There were no flames below the roof. On this visit, the plaintiff's wife threw the wall switch controlling the single electric light bulb, which was suspended from overhead, and the light came on. There was no other wiring at or near the roof, and there was no fire in the furnace and no fires or heating elements in the attic.

On the afternoon previous to the day of fire, the defendant's workmen were engaged in completing the laying of the new roof over the old shingles on the east slope of the pitch roof between the chimney and dormer in question. They had completed that work before the end of the work day, and, on the morning of the fire, they were laying the new shingles on the dormer in question and completing the ridgeroll on the main north and south ridge of the house, by trimming the shingles which extended above the ridge on one side and bending the shingles from the other side over the peak of the ridge. All of this work had been completed when the workmen left the roof for lunch, and there remained nothing but the removal of wooden 2 x 4s which had been clamped to the roof for the workmen's use in ascending and descending the pitch roof, and the clamps connected therewith, and, presumably, litter and debris from the trimming of the new shingles.

Better Homes Inc. attempted to rebut the circumstantial case made by the plaintiff Hill by assuming the burden of proving that, under the circumstances, neither a lighted cigarette nor a burning match could have caused the fire. It contends that it carried that burden to the point that the issue should not have been submitted to a jury.

The argument poses the following syllogism:

(1) It is impossible for a lighted cigarette or burning match to ignite the exposed surface of the asphalt shingles;

(2) the roof area where the fire occurred had been completely covered with the new asphalt shingles the afternoon of the day before the fire;

(3) therefore, the fire could not have been caused by a lighted cigarette or match dropped on the day of the fire.

Better Homes Inc. next argues that the fire could not have been caused by a lighted cigarette or burning match dropped on the wood shingles before they were covered up on the afternoon of the day before the fire, because, while it is possible that a cigarette or match could smoulder for a considerable period, if supplied with oxygen through cracks or openings into the attic, such smouldering would have produced an odor of smoke and fumes which Mrs. Hill necessarily would have noticed on her 8:30 A.M. visit to the attic.

There were no contentions in the case that the asphalt shingles are fireproof. An expert for the plaintiff testified that they would burn upon application of sufficient heat, and that it was possible that they could be ignited by a cigarette or lighted match if applied to the edge of a shingle. The shingles are of rag and asphalt composition, treated on the outside or upper surface with "granulite", which is granulated silica or crushed stone. The testimony was that they are classified by the "Underwriters Laboratory in Chicago" as "Class C", which means that they had passed a test without igniting in which a jet gas flame is applied to the upper surface for two minutes, followed by a cooling period of two minutes and another application of

flame of two minutes' duration. One witness for Better Homes Inc. testified that it would take a heat intensity of 400° to ignite the upper surface of the shingle. The testimony was that the tar paper upon which the shingles were laid is highly inflammable, and that the old wood shingles beneath the tar paper had not been treated in any way and had been on the roof for at least twenty-three years.

The syllogism does not postulate enough. It would seem entirely possible that a lighted cigarette or match could be dropped or discarded by one of the workmen while working on the ridge of the roof, and dropped onto the exposed wood shingles before the ridge was "rolled" or capped, and, if by reason of warped or broken shingles an avenue of descent was open, could roll in the vicinity of the portion of the roof in which the fire developed.

Singularly enough, another possibility was present which does not seem to have occurred to counsel. No point was made of the wooden 2 x 4s which were present on the surface of the roof. Better Homes Inc. produced no evidence as to the nature of these 2 x 4s or their location. There was no testimony as to whether they were new or old, splintered, cracked or whole. It would seem entirely plausible that a lighted cigarette dropped by a workman on the ridge could roll down and come to rest against the lower corner of one of these 2 x 4s; that it would there smoulder long enough to ignite the 2 x 4; that the burning 2 x 4 would heat the edge of an asphalt shingle to the combustion point. Even if the new shingle were not ignited to its combustion point, there might be sufficient heat transference to bring the highly inflammable tar paper and the tinder-dry wood shingles to their combustion points. Flame so caused would meet all of the characteristics of this fire.

On the whole record, I am convinced that the cause of the fire was a jury question.

Judgment will be entered for the defendants.

This opinion shall be taken to comprise my findings of fact and conclusions of law under Rule 52, 28 U.S.C.A.