Constance A. McCLUNG, Plaintiff,

v.

William Massie SMITH, Jr., and Paxson, Smith, Gilliam & Scott, P.C., Defendants.

Civ. A. No. 3:93cv549.

United States District Court, E.D. Virginia.

Dec. 20, 1994.

Thomas E. Albro, Patricia D. McGraw, John K. Taggart, III, Tremblay & Smith, Charlottesville, VA, for plaintiff.

William D. Bayliss, Dana D. McDaniel, Robert T. Mayo, Williams, Mullen Christian & Dobbins, Richmond, VA, for defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

Constance A. McClung instituted this action against William Massie Smith, Jr. and Paxson, Smith, Gilliam & Scott, P.C., the law firm in which he was a partner, to recover damages that McClung claims to have sustained as the consequence of legal malpractice. The case was tried to the court, sitting without a jury, and was submitted for decision following briefing and argument.

### THE GENERAL BACKGROUND

On October 26, 1976, McClung married John Lowe, a lawyer then engaged in the general practice of law in Charlottesville.[1] It was the second marriage for each party. McClung's son from her previous marriage was subsequently adopted by Lowe. The couple lived in Charlottesville in what is referred to as the Blue Ridge Road house which Lowe owned when he and McClung were married. After McClung funded more than $100,000 in improvements to the Blue Ridge Road house, it was titled jointly.

McClung was not employed outside the home during the marriage, but she contributed substantially to the family's income from the annual yield of the "Dadiani" and the "Anthony Oil" trusts, both of which were her separate property. Both trusts were administered by the Leavenworth National Bank & Trust Company in Leavenworth, Kansas ("LNB"). From 1978 to 1989, the trusts generated approximately $422,000 in income. In addition to the trust income, McClung received other separate funds by gift and inheritance, which she contributed to the

marriage.[2] Lowe's sole source of income was his law practice which, during that same period, generated approximately $644,000 in income.

During the marriage, Lowe handled all of the couple's financial transactions, including McClung's individual finances. Lowe established an account in her name and deposited approximately $500.00 each month to fund certain household expenses and McClung's personal expenses.

As early as 1980, McClung reported to her psychiatrist that she was having marital difficulties with Lowe. (Tr. 251). Not long thereafter, McClung developed a dependency on alcohol which grew progressively worse. Lowe was fully aware of her dependency and the results of it. (PEx. 88; PEx. 89). In the Spring of 1988, McClung was admitted to Springwood, a drug and alcohol rehabilitation clinic. McClung's indulgence in alcohol was accompanied by numerous acts of adultery, all of which were subsequently condoned by Lowe. The record does not reflect a possible cause of McClung's alcoholism, but it convincingly demonstrates that McClung was substantially weakened by her addiction to alcohol and that, with Lowe's encouragement, she became evermore dependent upon him to handle her financial affairs.

The central focus of this action is Lowe's use of McClung's separate funds for the purchase of two beachfront properties in Emerald Isle, North Carolina: the "Sea Dunes house" and the "Inlet Drive house." Further evidence of the extent of Lowe's control over McClung's affairs is found in a general power of attorney she executed in Lowe's favor in July 1978 (PEx. 177, p. 1) and in a special power of attorney she executed in February 1988 to allow Lowe to handle a refinancing of the Inlet Drive house. (PEx. 127; PEx. 177, pp. 2–3).

McClung asserts that Smith committed malpractice in two ways. First, he is alleged

---

1. Many of the exhibits refer to McClung by her married name Constance A. Lowe. For convenience, she will be referred to here only as McClung.

2. Lowe admitted at deposition that "the hard numbers of money coming into the marriage were coming in heavily on the side of Connie" and further that "[t]he kinds of contributions I was making I think would be much more vague and arguable." (PEx. 189, part 1, page 19).

to have breached his contract of employment to secure an accounting from Lowe for the misappropriation of certain separate funds entrusted to him by McClung for purchasing and building the Sea Dunes house and the Emerald Isle house. Second, he is alleged to have negligently represented McClung in the divorce and dissolution proceedings instituted by Lowe.

## DISCUSSION

The basic legal principles against which Smith's conduct must be measured is the law of legal malpractice of Virginia. It is well-settled that lawyers are charged with the obligation to use a reasonable degree of care, skill and diligence in handling the matters entrusted to them and are bound contractually to perform the work they agree to undertake for their clients. *Glenn v. Haynes*, 192 Va. 574, 66 S.E.2d 509, 512 (1951). To prevail in an action for legal malpractice, a plaintiff must prove: (1) the attorney's employment; (2) neglect or breach of duty; and (3) a loss proximately caused by that neglect or breach. *Stewart v. Hall*, 770 F.2d 1267 (4th Cir.1985).

Because negligence is actionable only if it was the proximate cause of the claimed damages, *see Maryland Casualty Co. v. Price*, 231 F. 397 (4th Cir.1916), proof of negligence alone is an insufficient basis for recovery. *Duvall, Blackburn, Hale & Downey v. Siddiqui*, 243 Va. 494, 416 S.E.2d 448 (1992). This means that:

> [I]n making the determination that an attorney's negligence proximately caused a client's damages, the trier of the malpractice action must find that the *result in the underlying action would have been different but for the attorney's negligent performance.*

*Stewart*, 770 F.2d at 1269 (emphasis added). Thus, the trier of fact in the malpractice action must consider the merits of the underlying action, and consequently the plaintiff must prove a "case-within-the case." *See Stewart*, 770 F.2d at 1270; *Byrd v. Martin, Hopkins, Lemon and Carter, P.C.*, 564 F.Supp. 1425 (W.D.Va.1983) (diversity legal malpractice action under Virginia law required court to assess merits of the underly-

ing claim), *aff'd*, 740 F.2d 961 (4th Cir.1984); *Goldstein v. Kaestner*, 243 Va. 169, 413 S.E.2d 347 (1992).

There is no single formula for measuring damages in legal malpractice actions; and therefore, the appropriate measure of damages must be determined by the facts and circumstances of each case. *Duvall*, 243 Va. 494, 416 S.E.2d at 450. Damages will be calculated on the basis of the value of what was lost or the consequences of the adverse judgment suffered by the client; and, although the client is not required to prove the exact amount of incurred damages, she is required to show facts and circumstances from which the trier of fact can make a reasonably certain estimate of those damages. *Id.* But, the actual damage requirement does not permit a negligent lawyer to evade responsibility for malpractice by claiming that the damages are too "speculative" in nature to be determined. *Better Homes, Inc. v. Rodgers*, 195 F.Supp. 93 (N.D.W.Va.1961).

The Virginia Supreme Court, in *Allied Prods., Inc. v. Duesterdick*, 217 Va. 763, 232 S.E.2d 774, 776 (1977), cited the following rationale for requiring the plaintiff to prove actual injury:

> If an attorney, in disregard of his duty, neglects to appear in a suit against his client, with the result that a default judgment is taken, it does not follow that the client has suffered damage, because the judgment may be entirely just, and one that would have been rendered notwithstanding the efforts of the attorney to prevent it.

*Duesterdick*, 232 S.E.2d at 775 (citing *Price*, 231 F. at 402). Even after a client has proved her case, if she "has suffered a judgment for money damages as the proximate result of [her] lawyer's negligence, such judgment constitutes actual damage recoverable in a suit for legal malpractice only to the extent such judgment has been paid." *Id.*, 217 Va. 763, 232 S.E.2d at 717.

With these principles in mind, and on the basis of the facts proved by a preponderance of the evidence, the court considers McClung's claims that Smith was negligent in failing to institute an action for an ac-

counting and in representing her in the divorce proceedings.

# I

## SMITH'S FAILURE TO SECURE AN ACCOUNTING OF LOWE'S MISHANDLING AND MISAPPROPRIATION OF McCLUNG'S SEPARATE FUNDS

### The Purchase Of The Sea Dunes House

In the summer of 1983 Lowe and McClung decided to purchase a beach house located on Sea Dunes Drive in Emerald Isle, North Carolina. By letter dated September 27, 1983, Lowe outlined to McClung's grandfather, D.R. Anthony, III, the reasons which prompted the desire to purchase the Sea Dunes house and asked for a loan with which to purchase it.

Lowe sent the letter "at Connie's request." (PEx. 83). He represented that the Sea Dunes house was a good investment and had the potential to be a retirement home. He explained that they needed the loan because their financial reserves had been exhausted by debt which Lowe had incurred to finance an ill-fated representation referred to as the "Garwood case" and by educational expenses for their son. (PEx. 83).

The requested loan was in the amount of $159,000. To that end, Lowe represented the following:

> Is it possible for Connie to obtain the money for this house from an advance against an estate or trust of which she is a present or future beneficiary? The house would be titled in Connie's name. Connie understands that if such an advance required selling of assets, incurring capital gains taxes, those tax payments would be added on to the $159,000.00 as an advance.

> If that is not possible, could an estate or trust lend her the money on some sort of delayed payoff of principal and interest in several years? If not, could she obtain a loan from or through you, secured by a lien against the corpus of her share of the Dadiani trust or other inheritance?

> Connie asked me to emphasize that any assistance she received would be kept completely confidential, with only you knowing about it.

> I am sending this by mail express to get it to you promptly. Connie is worried about someone else seizing the chance to pick up this exceptional buy before we have our finances lined up.

(PEx. 83, p. 2).

In response, McClung's grandparents loaned McClung and Lowe a total of $95,000 ($60,000 from Mrs. Anthony in three installments and $35,000 from Mr. Anthony in two installments). (PEx. 84). On October 16, 1983, McClung's grandfather confirmed delivery of checks to McClung totalling $95,000 and suggested that McClung's disbursement from the Anthony Oil trust in the amount of $8,750 should also be applied to the purchase of the Sea Dunes house. (PEx. 84). The correspondence surrounding the transaction reflects that these funds were to be advanced temporarily pending permanent financing at a lower interest rate than was then commercially available. The loans were evidenced by five promissory notes in the total amount of $95,000 which were executed by Lowe and McClung and sent to McClung's grandparents on October 24, 1983. (PEx. 85).

McClung understood that the proceeds of the $95,000 loan from the Anthonys and a distribution of $8,750 from the Anthony Oil trust, a total of $103,750, were to be applied as a payment toward the purchase price of $159,000, leaving a balance of $55,250, which McClung understood was to be financed by a loan from Cooperative Savings and Loan Association in Jacksonville, North Carolina ("Cooperative"). In reality, however, only $55,343.43 of the $103,750 was deposited with Cooperative because Lowe used slightly more than $48,000 of these funds to pay his separate credit card debts. (Tr., 209–10; PEx. 189, part 2, pages 46–49; 137–38). Of the $55,343.43 actually deposited in Cooperative, only $34,129.68 was actually applied to its intended purpose: acquisition of the Sea Dunes residence. (PEx. 117; PEx. 171). Lowe was unable to explain the disposition of the difference of approximately $21,000, but plaintiff's expert, G. David Hamar, determined that it was used to service the mortgage debt. (PEx. 171). McClung never au-

thorized the use of these funds for any purpose other than the purchase of the Sea Dunes house. (Tr. 210).

The funds entrusted to Lowe for that purpose were deposited in an account at Cooperative which was to be solely in McClung's name. (PEx. 87). The bank erroneously established a joint account and, on February 13, 1984, Lowe instructed Cooperative to rectify the error, but confirmed that he was entitled to write checks against McClung's account because: "I handle the check writing for her in regard to her expenses...." (PEx. 87).

The undisputed record is that the $69,620.12 of the $103,750 entrusted to Lowe for the purchase of the Sea Dunes house was not available for that purpose at the closing. Consequently, it was necessary to replace those funds with the proceeds of a larger loan from Cooperative. The mortgage therefore was $124,000 rather than the $55,250 to which McClung had agreed. (PEx. 116; PEx. 117). McClung learned of the discrepancy at closing, but Lowe declined to explain it and McClung did not press the matter.

Although the Anthonys received an annual interest payment in 1985, there were no further payments made on the loans. (PEx. 86). At the time of Mr. Anthony's death in March 1988, the unpaid principal and interest was $104,572.88. As contemplated in the original financing proposal made by Lowe in 1983 (PEx. 83), the unpaid loan balance was satisfied by a charge against McClung's share of a trust which became available upon her grandfather's death. (PEx. 94).

In sum, the preponderance of the evidence shows that Lowe acted on McClung's behalf in securing the loan, handling the loan proceeds, arranging the purchase of the Sea Dunes house and dealing with Cooperative respecting the financing for it. Although Lowe assumed liability on the underlying notes, the loan proceeds were deposited in an account in McClung's name. The advance from the Anthony Oil Account also was McClung's separate property.

By agreement between McClung and Lowe, her separate funds were to be applied for the purchase of the Sea Dunes house with the understanding that they would be replaced promptly upon the obtention of permanent financing at a lower interest rate. That never occurred. Therefore, when McClung's grandfather died, the loan deficiency was assessed against her.

### The Purchase Of The Inlet Drive House

In 1986, McClung and Lowe decided to build a new, larger home on Inlet Drive in Emerald Isle. Lowe and McClung agreed to finance the purchase of a lot and the construction of the house with loan proceeds and with the equity in the Sea Dunes house, which they planned to sell.

They agreed to purchase the beach front lot on Inlet Drive from Mr. and Mrs. Royall for $185,000. The down payment of $40,000 was borrowed from LNB on December 19, 1986. That loan was evidenced by a promissory note executed by Lowe and McClung and secured by a pledge of McClung's trust assets. (PEx. 120). McClung and Lowe understood that the loan proceeds were to be used to purchase the lot. As was true generally and in respect of the Sea Dunes transaction, Lowe acted for McClung in arranging the purchase and in handling the loans. The Royalls financed the $145,000 balance of the purchase price taking back a deed of trust as security for the note (PEx. 121).

In March 1987, Lowe approached LNB in pursuit of a $200,000 loan to finance construction of the house on the lot purchased from the Royalls. McClung agreed that Lowe should act in her behalf, understanding that the proceeds were to be used for construction and that they would be replaced when permanent financing was concluded. By letter dated March 5, 1987, Barker confirmed that LNB would advance $200,000 to Lowe and McClung for this purpose (PEx. 123), and a promissory note reflecting the advance of these funds was executed on April 29, 1987 by McClung and Lowe. (PEx. 122). This loan too was secured by McClung's interest in the two trusts held at, and administered by, LNB.

The funds borrowed from Leavenworth were disbursed upon Lowe's request into a joint LNB bank account against which Lowe drew numerous checks. At deposition, Lowe

was unable to recall the exact disposition of the $200,000 loan from LNB in April 1987, but he acknowledged having disbursed $121,000 to himself by checks on which he was the payee. Plaintiff's expert accountant, G. David Hamar, traced the funds and determined that the loan proceeds were disbursed as follows:

(1) $121,500.00 to John Lowe;

(2) $17,811.17 to Kurtis Chevrolet for a Blazer titled to the law firm of Lowe & Jacobs, P.C.; and

(3) $60,000.00 total to L. Martin (the Builder of the Inlet Drive house);

for a total of $199,311.77. (PEx. 171).

Later in 1987, again acting upon McClung's agreement and purportedly on her behalf, Lowe requested an additional $100,000 loan from LNB for the purpose of completing construction. LNB made the loan which was evidenced by a promissory note in the principal amount of $100,000. The note, dated November 10, 1987, was executed by McClung and Lowe and the proceeds were deposited in the joint LNB account. This loan, too, was to be repaid once permanent financing was in place and it too was secured by McClung's interest in the Anthony Oil and Dadiani trusts (PEx. 122). At deposition, Lowe claimed no recollection respecting the disposition of the loan proceeds except that he wrote checks to himself in the amount of $43,000. However, by tracing the funds from various bank records, Hamar determined that the $100,000 loan was disbursed as follows:

(1) $4,700.00 to various unidentified payees;

(2) $25,000.00 to United Virginia Bank;

(3) $43,000.00 total to Lowe;

(4) $25,000.00 to L. Martin (builder);

The traceable disbursements, of which only $25,000 appears to be related to the Inlet Drive house, totalled $97,700. (PEx. 171).

The record establishes that McClung understood[3] that the loans of $100,000 and $200,000 by LNB, which were secured by

McClung's separate assets in the Anthony Oil and Dadiani trusts, were to be used to finance construction of the Inlet Drive house and that the loans were to be repaid when permanent financing was secured from First Southern Mortgage Company. At deposition, Lowe confessed to the same understanding. In fact, he told LNB's Barker that McClung and he intended the LNB loans to be a bridge, or temporary construction loans, to be repaid either upon permanent financing or from a large judgment Lowe expected to secure in pending litigation. (Lowe Dep., PEx. 189, part 2, pp. 160–161). Lowe later acknowledged having told Barker that the loans would be repaid from permanent financing to be obtained from First Southern Savings Bank. (Lowe Dep., part 2, pp. 168–69).

The record establishes that, as in the Sea Dunes transaction, Lowe assumed responsibility for the transactions which produced loans from LNB totalling $340,000, which encumbered McClung's assets in that amount. The testimony of Barker, Lowe's deposition testimony, and documents executed in connection with the LNB and First Southern transactions confirm McClung's understanding about how the $340,000 borrowed from LNB was to be repaid. First, the permanent loan of $300,000 from First Southern would yield $115,000 after satisfying the deed of trust note held by the Royalls and the original $40,000 loan from LNB for the lot. In that regard, the loan application to First Mortgage, which Lowe executed for McClung as her attorney-in-fact discloses that the purpose was to "payoff construction and Lot loan." Second, it was estimated that the net equity to be realized after sale of the Sea Dunes house would be $75,000. (PEx. 91). Third, the net equity from the sale of the Blue Ridge Road home in Charlottesville jointly owned by McClung and Lowe was projected to be $150,000. (PEx. 91). The funds from these sources would discharge yield a total of $340,000 which would discharge the indebtedness to LNB, thereby removing encumbrances from McClung's trust assets and would leave the couple with

---

**3.** On May 17, 1988, Lowe confirmed in a letter to LNB his understanding that the purpose of these loans was to finance a real estate purchase. The letter also outlines a repayment plan, but the plan was never implemented by Lowe. (PEx. 91).

the Emerald Isle house and a mortgage of $300,000 in favor of First Southern.

As part of the process of approving the $300,000 permanent financing loan, First Southern obtained an appraisal of the Inlet Drive property from Hockenyos Appraisal Services. The appraisal was signed by Robert Smolenski as "appraiser" and by Mark Hockenyos as "review appraiser." It valued the property, including both the lot and improvements, at $430,000 as of January 13, 1988. (PEx. 136).[4]

The Inlet Drive house was completed on March 1, 1988 and the proceeds of the permanent loan were disbursed on March 4, 1988. (PEx. 128–129). However, notwithstanding Lowe's representations to First Southern and Barker at LNB respecting the proposed use of the First Southern proceeds, the loan proceeds were not used to satisfy the temporary loans made by LNB and secured by McClung's trust assets. Instead, the permanent financing, after deductions for prepaid financing and closing charges, was disbursed as follows:

1. $162,909.78 was used to satisfy principal and interest on the Royall note;

2. $43,673.99 was escrowed for completion of the construction;

3. $10,696.26 was used to pay points and interest for First Southern;

4. $50,343 was used to pay off the second mortgage which NCNB held on the Sea Dunes house;

5. $10,378.62 was used to discharge Lowe's separate obligation to Maryland National Bank Association;

6. $12,245.85 was used to satisfy Lowe's separate obligation to Central Fidelity Bank; and

7. $9,752.41 was used to pay Lowe's separate obligation to United Virginia Bank.

(PEx. 171; PEx. 128). These payments, totalling $288,978.91, were made at Lowe's direction. At deposition, Lowe admitted that payments made to Maryland National Bank

Association, Central Fidelity Bank, and the United Virginia Bank, were in satisfaction of his sole, and separate, indebtedness. (PEx. 129; PEx. 189, part 2, pages 171–173). None of the permanent loan proceeds were applied to the LNB loans which then totalled $340,-000, plus interest.

As a consequence, some of McClung's separate assets, which were pledged as security to LNB, were applied to curtail the loan balances as they came due. (PEx. 94). Specifically, on March 1, 1988, LNB charged McClung's trust with $40,000 to discharge the first of the three LNB loans. On the same day, LNB applied $60,000 to partially curtail the $200,000 loan. Also, between 1987 and 1988, LNB applied $83,354.55 of McClung's assets to further curtail the LNB loans (PEx. 138; PEx. 139; PEx. 171). The record also shows that on July 13, 1988, LNB received a check for $50,000 from the law firm Lowe & Jacobs which was applied to reduce the $100,000 and the $200,000 loans by $25,000 each. (PEx. 171). The balance of the LNB loans was satisfied by a payment of $145,634.53 which apparently came from the sale of the Blue Ridge Road house. (PEx. 171).

### The NCNB Line Of Credit

At about the time Lowe arranged the last loan from LNB for the purpose of completing the Inlet Drive house, he undertook to arrange for himself a line of credit with NCNB National Bank of North Carolina. On December 22, 1987, Lowe applied for, and received, a line of credit from NCNB in the principal amount of $50,000. Notwithstanding that the application was not signed by McClung, Lowe listed her name as an applicant. The application listed, as assets, the Sea Dunes house; McClung's interest in the Dadiani trust which in the application Lowe valued at $750,000; McClung's interest in her grandfather's estate; and Lowe's law practice, which on the application Lowe valued at $150,000. (PEx. 132). A later document substituted the Inlet Drive house for the Sea

---

4. First Southern was provided with a satisfactory completion certificate dated March 1, 1988 from Hockenyos Appraisal Services certifying that "with the exception of certain items costing ap-

proximately $20,000 to $25,000 to complete, all conditions to the earlier appraisal had been met." (PEx. 136).

Dunes house on the asset list. At various times, both houses were mortgaged as security for the NCNB line of credit.

The NCNB line of credit was advanced, and paid off in full, on three separate occasions, for a total of $148,866.74. The first payoff was in March 1988 from the proceeds of the First Southern mortgage. The second payoff was in June 1988, by a check in the amount of $50,000 drawn on the account of Lowe and Jacobs. The third payoff was in March 1989 from the sale of the Sea Dunes house. (PEx. 189, Lowe Dep., part 2, page 147–150; PExs. 104, 129, 130, 132, 133, 171). At deposition, Lowe claimed not to recall how he used any of the $150,000 he borrowed against the NCNB line of credit, but he acknowledged that McClung never drew funds from the NCNB line of credit.

### McClung's Retention Of Smith

Although McClung and Lowe resumed a marital relationship after her release from Springwood in 1988, the marriage continued to deteriorate. The process was accelerated by McClung's increasing suspicions respecting Lowe's past handling of her separate assets.

In early January 1989, McClung met with Smith because of her stated concern that Lowe may have misused her separate funds and because of her desire to put her finances into order. To obtain that result, McClung retained Smith to determine the uses to which her funds and separate property had been put by Lowe who had managed all of her financial affairs. (Smith's Dep., pp. 14, 19–20; Tr. 223, 294, 297). McClung explained to Smith that she desired an accounting of her separate funds. Her principal concern was that Lowe may have been misapplied, or misappropriated, the funds which she had entrusted to him for the sole purpose of purchasing and constructing the two beach homes. McClung also provided Smith with evidence that her grandfather had loaned McClung funds to purchase the Sea Dunes house and with other rudimentary financial information as well as the names of individuals at LNB.

Smith agreed to represent McClung in this endeavor, notwithstanding that he had no previous experience in obtaining accounting of funds in fiduciary relationships. (Smith Dep., pp. 12–13, 67–68). The law firm opened a file entitled "General Business/Financial" representation. The first of the few efforts Smith made to fulfill this obligation occurred on January 31, 1989, when Smith informed Barker at LNB that McClung "has recently concluded that she needs to regain control of her financial affairs. Apparently, for the past ten or twelve years her husband, John C. Lowe, has regulated these matters, including her dealings with Leavenworth National Bank." (PEx. 93). Smith went on to explain that he was attempting to help McClung "piece together the details of her finances" and requested Barker to provide "as much background information as you can conveniently provide," (PEx. 93) including "copies of the instruments creating the trusts from which [McClung's] income is derived, together with copies of transaction reports, correspondence from John C. Lowe, file memoranda and the like." (PEx. 93). Smith also asked for information regarding "the nature and amounts of the obligations of Mr. and Mrs. Lowe, secured by the North Carolina real estate, or otherwise, to the trusts." (PEx. 93).

Barker responded on February 17, 1989, by providing a copy of the will creating the Dadiani trust in which McClung held a ⅛th income interest, and copies of the 1988 reports for the Dadiani trust and for the Anthony Oil trust in which McClung held a ¼th interest. Barker also informed Smith that on March 3, 1988 McClung had received a distribution in the amount of $261,974.11 representing her ¼th share of a trust distributed on the event of her grandfather's death. Barker outlined the distribution as follows:

1. $104,572.88 used to pay off the original $95,000 in loans from the Anthony's which were intended to be a down payment on the Sea Dunes house, upon which no payments had been made;

2. $100,000 applied to loans made by LNB;

3. $57,401.23 was forwarded to McClung.[5]

**5.** McClung claims that, until discovery during this action, she had believed her interest in her

(PEx. 94). Finally, Barker informed Smith that the outstanding loan balance owed to LNB as of February 17, 1989 was $152,977.46 and that LNB was applying all of McClung's income interest to pay off the two remaining notes as provided in the security agreements.

Smith also made inquiry of Roger Moore, an attorney in Jacksonville, North Carolina on February 2, 1989. Smith informed Moore that McClung was "attempting to piece together the details of her finances as quietly and delicately as possible." To assist in that process, Smith asked Moore to determine the title of record on two parcels of real estate owned by McClung and Lowe on Emerald Isle. (PEx. 178).

. To assist Smith's investigation into her finances, on March 1, 1989, McClung delivered Smith checks from the Cooperative checking account and advised Smith that she had asked Lowe for the checkbook for that account. The same day Smith requested Cooperative to close the joint account and open a separate account in McClung's name. To that end, Smith enclosed a blank check drawn on the Cooperative joint account and explained that McClung "requests that you complete [this check] to close-out that account" and instructed Cooperative that the "enclosed, completed check" was to be used "to open a new account in her name." (PEx. 179).

After Smith accepted the assignment to help McClung secure an accounting of her finances, the Sea Dunes house and the Blue Ridge Road house were sold. The Sea Dunes house closed on March 15, 1989 with total proceeds of $186,146.27 disbursed as follows:

1. $113,296.41 to repay the Cooperative indebtedness (originally $124,000);
2. $49,523.65 to repay NCNB for a second mortgage that is held on the Inlet Drive property;
3. $10,791.50 in miscellaneous charges including sales, commissions, title insurance, taxes; and

4. $12,484.71 to Lowe and McClung.

(PEx. 130). The Blue Ridge Road house closed on March 31, 1989. The sale price was $330,000 of which $319,044.14 was disbursed in cash and the purchasers gave a note for $10,000. The sale proceeds were distributed as follows:

1. $86,859.04 to Atlantic Financial, the holder of the first mortgage;
2. $66,185.64 to Crestar, the holder of the second mortgage; and

(PEx. 131). This left a net balance to McClung and Lowe of $165,905.90 after payment of some closing costs. Of this amount, $145,634.53 was paid to LNB to satisfy the principal and interest remaining on the $100,000 and $200,000 loans. (PEx. 171). Of the remaining $21,000, $11,000 was used to pay tuition for Christian Lowe and $10,000 was to be given to McClung. However, she never received that payment. As of March 1989, the Sea Dunes and the LNB obligations had been discharged and there remained a debt of $300,000 to First Southern secured by a mortgage on the Inlet Drive house.

Thus, by March 1989, Smith had knowledge that substantial amounts of McClung's separate funds which had been entrusted to Lowe were unaccounted for. Other parts of the record confirm that Smith was aware of the possibility that Lowe had misappropriated or misapplied McClung's funds and of the consequent need to secure an accounting from Lowe.

For example, when Lowe discovered that McClung had retained Smith to determine the state of McClung's financial affairs and Lowe's handling of her funds, he became incensed over McClung's desire to probe his handling of her funds. The couple separated on March 26, 1989. Lowe refused to discuss his handling of McClung's funds. This, of course, should have alerted Smith that Lowe considered, as a matter of concern, his financial stewardship of McClung's assets.

On July 31, 1989, Smith informed Lowe that McClung expected him to make the June and July mortgage payments on the

grandfather's trust was only $57,401.23. It was not until then that she claims to have realized the rest of the proceeds had been applied to satisfy

joint obligations which she believed had been paid off.

First Southern mortgage, which was secured by the Inlet Drive house. Smith stated that McClung's expectations were based upon the fact that:

> *$96,000.00* from her grandfather's estate was intended to be put *into the house*, but was *apparently used by you for other purposes*. In addition, approximately $30,000.00 from the North Carolina account ($11,000.00 of which has been repaid from the Crestar joint account) was spent by you in various ways *contrary to the agreement between you and Connie as to the purpose of that account, which was established with her money*.

(PEx. 180) (emphasis added).

Subsequent related events also confirm that Smith understood the need for an accounting. For example, Lowe refused the July 1989 request that he make the mortgage payments on the Inlet Drive house and the loan went into default. To prevent foreclosure, Smith wrote, at McClung's request, McClung's grandmother on October 18, 1989, requesting a loan in the amount of $50,000. (PEx. 97). Smith's letter reflects two telling observations. First, he said: "... it was and is Connie's money which was used to purchase the land and build the [Emerald Isle] house." (PEx. 97). Then, describing the mission for which he had been retained, Smith said: "[a]t some point *we trust the Court will require John to ... provide her an accounting* for the money *which we feel he has manipulated over the years*. The problem is timing. It is unlikely we will obtain a resolution from the Court before foreclosure proceedings are instituted." (PEx. 97) (emphasis added). On November 24, 1989, McClung's grandmother loaned her $50,000 to prevent foreclosure. (PEx. 185). Smith, however, took no steps to implement the assignment he had undertaken for McClung.

In fact, the record shows that the only measures Smith took in furtherance of the representation was to request a limited number of records from LNB; to ask a North Carolina lawyer to determine the way in which certain real estate was titled; and to review the checking account records from Cooperative and close and reopen that ac-

count. To the extent that Smith attempted, at trial, to suggest that he had taken undefined other measures to investigate the nature and extent of Lowe's handling of McClung's separate funds, the court declines to credit his testimony because on this subject, and in general, Smith is not worthy of belief. He is a convicted felon and his testimony before this court on that issue, and several others, does not square with the record. Furthermore, Smith's demeanor while testifying was that of a man who was willing to say anything in order to avoid facing the consequences of his abject performance as a lawyer in discharging the duties McClung had retained him to perform.

The evidence establishes that McClung and Lowe agreed that her separate funds would be used to purchase the Sea Dunes and Inlet Drive houses. Lowe, acting for McClung, in pursuit of that purpose received the proceeds of the loans from McClung's grandfather ($95,000), the distribution from the Anthony Oil Account ($8,750), and the three LNB loans ($340,000). Lowe did not apply those funds to the limited purposes for which they were entrusted to him. If he had, the permanent financing would have discharged the loans and McClung's assets would not have been applied to satisfy any of them.

The record establishes clearly and convincingly that Lowe applied some of the funds he secured to discharge his own separate indebtedness. In like measure, it proves that Lowe was unable to account for substantial amounts of the funds entrusted to him.

### McClung Would Have Been Entitled To An Accounting From Lowe

■ The few steps that Smith took toward fulfilling the representation yielded enough information to demonstrate that something was seriously amiss in the way that Lowe had handled McClung's separate funds, yet Smith failed to follow through and, for all practical purposes, abdicated his professional responsibilities to his client. If Smith had made a reasonable inquiry, he would have determined that, as McClung's testimony and Lowe's own correspondence confirm, McClung and Lowe agreed that Lowe would have access to her separate funds for a spe-

cific purpose and that Lowe was to be responsible for the several, somewhat complex financial transactions by which those separate funds would be obtained, applied to the agreed upon purpose, and returned upon completion of permanent financing. That inquiry also would have shown that, at the time, Lowe was a practicing lawyer whose education, experience and knowledge of financial matters were far superior to McClung's and that, throughout the relevant period, McClung, who was weakened and vulnerable by her increasingly serious dependence upon alcohol, relied on Lowe to handle the financial transactions entrusted to him by virtue of their agreement.

■ In sum, a reasonable inquiry would have shown that Lowe was McClung's agent for, and in connection with, the purpose of obtaining access to, and use of, her separate funds to this specific, but limited, purpose. Agency is a fiduciary relationship created by express or implied agreement of the parties. Restatement (Second) Of Agency § 1 (1958). And, "[a]n agent is a fiduciary with respect to matters within the scope of his agency." Restatement (Second) Of Agency § 13 (1958); *H–B Ltd. Partnership v. Wimmer*, 220 Va. 176, 257 S.E.2d 770 (1979). The relationship of husband and wife does not *per force* establish an agency, but a spouse can be authorized to act as the agent of the other spouse. Restatement (Second) Of Agency § 22 (1958); *Littreal v. Howell*, 203 Va. 394, 124 S.E.2d 16 (1962); *Painter v. Lingon*, 193 Va. 840, 71 S.E.2d 355 (1952).

■ The agency relation is founded in an agreement between the parties, but the agency contract "is a special kind of contract, since an agent is not merely a promisor or a promisee but is also a fiduciary." Restatement (Second) Of Agency, Chapter 13, Topic 1, Introductory Note, page 171. Moreover, "[t]he existence of the fiduciary relation between the parties, and the duty of the agent not to act for the principal contrary to orders, modify all agency agreements and create rules which are sui generis and which do not apply to contracts in which one party is not an agent for the other. Further, unlike most other contracting parties, the agent may be subject to tort liability to the princi-

pal for failing to perform his duties." *Id.* Consequently, absent express agreement to the contrary, "... an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement (Second) Of Agency § 387 (1958); *Bull v. Logetronics, Inc.*, 323 F.Supp. 115 (E.D.Va.1971).

■ The unique nature of the agency relationship, and these fundamental principles of agency law, which are firmly imbedded in the substantive law of Virginia, create a wide range of remedies for a principal aggrieved by an agent's breach of contract or a breach of fiduciary duty. Thus, the principal may maintain an action for breach of contract, an action for tort, an action for restitution, either at law or in equity, or an action for an accounting. Restatement (Second) Of Agency § 399(a), (b), (d) and (e).

■ In *Klotz v. Klotz*, 202 Va. 393, 117 S.E.2d 650 (1961), the Supreme Court of Virginia was called upon to review an accounting pursuant to a partnership agreement between husband and wife. There, the court made clear that contractual arrangements between a husband and wife were to be treated in accordance with the law applicable to the agreement into which they had entered, holding that:

> the obligations of a business contract deliberately and fairly made between husband and wife are binding on them in the same manner as contractual obligations assumed by other contracting parties. (citation omitted) They may not be disregarded by one against the will of the other. Nor may their terms be changed at the whim or caprice of one of the parties, or by courts on a theory that different terms would now be more equitable. The relationship of partners is of a fiduciary character and imposes upon them the obligation to exercise good faith and integrity in their dealings with one another in the partnership affairs.

*Klotz v. Klotz*, 117 S.E.2d at 655. An agency relation, like a partnership, is also of a fiduciary character and the principles established in *Klotz v. Klotz* apply with equal force to an agency relationship.

■ Under Virginia law, an accounting is a form of equitable relief which is available upon order of a court in equity "providing for an accounting of funds among those with a partnership or other fiduciary relation inter se. Often these actions are a form of restitutionary relief, and may be sought along with purely restitutionary remedies...." Leigh B. Middleditch, Jr. and Kent Sinclair, *Virginia Civil Procedure*, § 3.4(I) (2nd Ed.1992).

> Accounting is a two-stage process. First, the account is to be stated; this is the determination of who owes what. Second, the account is to be settled; this is the payment by the debtor of the money found to be owing.

W. Hamilton Bryson, *Handbook on Virginia Civil Procedure*, Chapter XII, C, 2(c) (2nd Ed.1989). This fundamental equitable remedy has long been available to require trustees or agents to account for their actions in dealing with the funds of beneficiaries or principals. *Bain v. Pulley*, 201 Va. 398, 111 S.E.2d 287 (1959). Moreover, in the action for an accounting, the burden is on the agent to establish that he has properly applied or disposed of the assets entrusted to him by the principal. *Bain v. Pulley*, 111 S.E.2d at 291; *Boden v. Renihan*, 299 Mich. 226, 300 N.W. 53 (1941). Thus, McClung clearly would have been entitled to an accounting under well-settled principles of Virginia common law. And, she would have enjoyed, in that proceeding, the procedural advantage of having the burden of proof fall on Lowe.

■ Furthermore, Virginia recognizes that certain special relationships can create a fiduciary obligation. *Webb v. Webb*, 16 Va. App. 486, 431 S.E.2d 55 (1993). *See In re Decker*, 295 F.Supp. 501 (W.D.Va.1969), *aff'd sub nom., Woodson v. Gilmer*, 420 F.2d 378 (4th Cir.1970). Here, the record establishes that, for many years, Lowe had handled the complex marital finances and McClung's own separate finances; that McClung was not involved in the financial matters of the marriage; that, at the time the funds were entrusted to Lowe for the limited purpose of acquiring the beach front property, McClung was substantially weakened by her dependence upon alcohol; that, with Lowe's encouragement, she relied upon him to handle the separate funds to be applied to this limited purpose [6]; that Lowe was a professional who was knowledgeable about the legal and financial aspect of land transactions and financing thereof; and that McClung had virtually no knowledge of, or sophistication with respect to, such matters. Considering all of these virtually undisputed facts, McClung could have established the existence of a fiduciary obligation even if there had been no agreement to support an agency relationship. *Webb v. Webb*, 16 Va.App. 486, 431 S.E.2d at 58–60; *Boden v. Renihan*, 299 Mich. 226, 300 N.W. 53, 57–58 (1941). This fiduciary relationship also would have permitted an action for an accounting under Virginia common law.[7]

■ In addition to these common law remedies, an accounting in equity against a fiduciary is authorized by statute in Virginia. Va.Code Ann. § 8.01–31. McClung predicates her request for an accounting on both the common law and the right conferred by the statute.

Smith and the law firm advance several theories in support of their contention that McClung would not have been entitled to an accounting against Lowe. Each is addressed in turn.

First, they argue that the term "fiduciary" in § 8.01–31 is circumscribed by the definition of "fiduciary" in Va.Code Ann. § 8.01–2 which does not include "husband and wife"

---

**6.** The weakened condition of a principal is a significant factor in determining the nature and extent of the fiduciary duty of an agent. *Redford v. Booker*, 166 Va. 561, 185 S.E. 879 (1936).

**7.** The breach of a fiduciary duty creates a constructive trust by operation of law. *Greenspan v. Osheroff*, 232 Va. 388, 351 S.E.2d 28 (1986); *Horne v. Holley*, 167 Va. 234, 188 S.E. 169 (1936). The law of Virginia has long recognized that the relationship of husband and wife can form the basis for a confidential relationship which, if certain other circumstances are present, will warrant imposition of a trust. *See Hudson v. Clark*, 200 Va. 325, 106 S.E.2d 133 (1958); *Battle v. Rock*, 144 Va. 1, 131 S.E. 344 (1926). Thus, on this record, Lowe also could have been subjected to an accounting as a trustee, even if there were no agreement to support a finding of agency.

and this means, they say, that a husband or a wife is beyond the reach of the term fiduciary in § 8.01–31. "Accordingly, an accounting under § 8.01–31 is not available by one spouse against the other." (Defendant's Post–Trial Brief, pp. 5–6). The argument is without merit.

■ Section 8.01–2 is entitled "General definitions for this title." It provides

As used in this title, unless the context otherwise requires the term:

\* \* \* \* \* \*

(3) 'Fiduciary' shall include anyone or more of the following:
a. guardian,
b. committee,
c. trustee,
d. executor,
e. administrator, and administrator with the will annexed, or
f. curator of the will of any decedent.

That argument proves too much. The statutory definition of fiduciary is not an exclusive one. Rather, it simply specifies that certain kinds of fiduciaries are included in the term.

■ Moreover, there is no indication in the statute or in Virginia decisional law that the General Assembly intended Section 8.01–2 to supplant the well-settled common law pursuant to which an accounting is available to redress a breach of the fiduciary responsibility inherent in an agency relationship or in the special relationship shown to have existed here. For those reasons, the statute cannot be accorded the construction urged by Smith and the law firm.

Second, Smith and the law firm argue that allowing an accounting between a husband and a wife would have a "disastrous effect on marital harmony" and on "the judicial system." This argument is premised on the erroneous view that here an accounting is sought between a husband and wife "without the existence of another legal relationship between the parties." The record establishes both an agency reached by agreement between Lowe and McClung and the kind of special relationship which classically yields a fiduciary obligation. An accounting is available to remedy a breach of the fiduciary

duties thusly created. Accordingly, this policy argument is of no efficacy on the facts of this case.

Moreover, the defendants have cited, and the court has found, no authority which, in the name of furthering marital harmony, would exempt from the remedy of an accounting a spouse who has been entrusted with the separate funds of another for a limited purpose and misapplied them. The court declines the invitation to create such authority here.

Third, the defendants argue that the record does not establish an agreement between Lowe and McClung. The court has found otherwise and will not repeat here the reasoning which led to that finding.

Fourth, Smith and the law firm argue that Lowe did not receive McClung's separate funds because her trust was used as security for loans that were joint obligation and the proceeds of which were deposited in a joint checking account, thereby transmuting them to marital funds. This argument ignores the fact that the loans from the Anthonys and the Anthony Oil disbursement were deposited in an account which Lowe himself understood to be only in McClung's name.

Furthermore, the argument elevates form over substance. The undisputed record is that Lowe received the loan proceeds only because he arranged the transaction so that McClung's separate assets secured the loans. When the loans were not repaid, McClung's separate assets were used to repay them. Lowe, in essence, was entrusted with access to certain of McClung's separate funds in the form of their full credit value which he was to apply to a particular purpose so that McClung's separate funds would be freed and returned to her as separate property.

Lowe initiated the loans, arranged their terms and was fully aware of the consequences of a default. Thus, when he misapplied the loan proceeds, he did so with knowledge that the separate funds which had been entrusted to him to secure the loans automatically would replace the loan proceeds which he applied to his own use and misapplied in breach of his agreement and trust. Under

the facts of this case, the transmutation theory has no applicability.

Finally, Smith and the law firm argue that McClung is not entitled to an accounting because Virginia's equitable distribution scheme, Va.Code Ann. § 20–107, provides the only remedy available to adjust financial relationships during marriage. This argument, of course, wholly ignores that the facts here demonstrate the existence of an independent relationship, whether by agency or by a trust flowing from the special relationship recognized in *Webb v. Webb*, which supports entitlement to an accounting.

More importantly, the argument ignores the testimony of the expert witnesses presented by both sides which established that the scope of the financial adjustment provided by equitable distribution is limited by what is actually available at the end of the marriage to distribute which, of course, means that equitable distribution would never provide a spouse an adequate remedy for the dissipation or misapplication of separate funds entrusted to the other spouse unless the marital estate were sufficiently large to permit a recovery within the framework of equitable distribution.

 As the defendants point out, equitable distribution was enacted for the purpose of enabling courts to compensate spouses for their respective contributions to the acquisition of property obtained during the marriage without regard to title when the marriage is dissolved. The ultimate purpose is to divide fairly the marital assets taking into account their respective monetary and non-monetary contributions to the acquisition and maintenance of property and to the marriage itself. Swisher, *Virginia Family Law*, § 11–1, at 322 (1991). It is clearly, therefore, not the purpose of the equitable distribution scheme to deprive an aggrieved spouse of a generally recognized remedy for the misapplication or misappropriation of

separate funds entrusted to the other spouse pursuant to a special relationship.

Nor did the commencement of the divorce and dissolution proceedings preempt the availability of an accounting. The two proceedings could have progressed separately or, as acknowledged by both experts, they could have been consolidated for discovery, resolution by a commissioner and ultimate decision by the court. In either event, the state court could have assured that the two proceedings did not produce inconsistent or overlapping decisions.

### The Accounting

 Under Virginia law, the damages recoverable in an action for legal malpractice depend upon the nature of the injury caused by the malpractice. Hence, McClung must show with reasonable certainty the damage she sustained as a consequence of Smith's failure to secure an accounting from Lowe for his disposition of McClung's separate funds.

It is those separate funds that were amenable to an accounting because of the agreement and the special relationship which created a fiduciary duty in Lowe. The corollary of this proposition, of course, is that McClung has not shown entitlement to an accounting from Lowe for his handling of her separate funds not brought within the reach of the fiduciary duties thusly created.[8]

On this record, therefore, the focus of an accounting would be on: (1) the loans from McClung's grandparents and the Anthony Oil trust disbursement for purchase of the Sea Dunes house, the principal total of which was $103,750; and (2) the loans from LNB for the acquisition and construction of the Inlet Drive lot and house the principal total of which was $340,000. It therefore is necessary to determine what, of these sums, McClung lost.

---

**8.** Notwithstanding that Lowe handled the family finances and McClung's separate assets throughout the marriage and that McClung executed a general power of attorney in Lowe's favor in 1978 (which she claims verbally to have revoked in 1985), the proof does not establish, until 1983, either an agreement on how McClung's separate funds would be used or the coalescence of circumstances found to have created the special relationship which imposed a fiduciary obligation, even if no agreement had existed.

### 1. The Sea Dunes Transaction

■ The undisputed record is that McClung's inheritance from her grandfather was charged $104,572.88 to repay the principal and interest on the Anthony loans for the Sea Dunes house. In an accounting, it would have been Lowe's burden to account for the separate funds entrusted to him for the purchase of the Sea Dunes house. Considering that fundamental principle and the facts in this record, Lowe would not have been able to discharge his burden. Lowe admitted misappropriation of $48,000 to pay his separate credit card debt. It appears that $21,000 was used to service the Cooperative mortgage obligation and that $34,129.68 was applied originally to the purchase of the Sea Dunes house. However, it also appears that the equity in the Sea Dunes house was not used to satisfy the Anthony loans or was otherwise returned to McClung. Of the sale price, $186,146.27, Cooperative received $113,296.41; Lowe's personal line of credit was satisfied with a payment of $49,523.45; taxes, fees and commissions consumed $10,791.50; and a check for $12,484.71 was issued to Lowe and McClung (PEx. 130). Lowe could not explain the disposition of that sum. Nor was Lowe able to explain disposition of the Anthony Oil trust disbursements ($8,750). McClung therefore has proved damage in the amount of $113,322.88 attributable to Smith's malpractice in failing to secure an accounting respecting the Sea Dunes transaction.

### 2. The Inlet Drive Transaction

The record likewise establishes that Lowe received $340,000 in LNB loans secured by McClung's separate funds for the Inlet Drive transaction. McClung is entitled to an accounting of those separate funds. It, therefore, is necessary to assess how much, if any, of these funds McClung lost.

First, McClung's interest in her grandfather's testamentary trust was assessed $40,000 toward satisfaction of the $40,000 LNB loan. Second, $60,000 of McClung's interest in that trust was applied toward curtailment of the $200,000 LNB loan. Third, a total of $83,354.55 in McClung's trust assets were applied to further curtail the LNB loans. This loss totalled $183,354.55.[9] This amount also would have been amenable to the remedy of an accounting.

The record establishes that the LNB loan proceeds totalling $340,000, Lowe wrote checks to himself totalling $164,500 and that Lowe spent $17,811.17 for an automobile titled in his law firm's name, but used exclusively by him. This misappropriation of McClung's separate funds aggregated $182,311.17, leaving $1,043.38 untraced. Considering that the burden would have been on Lowe to have accounted for funds entrusted to him, McClung has established that Lowe would have been held accountable for the entire loss which she sustained in the Inlet Drive transaction.

However, it appears from the record that the builder of the Inlet Drive house actually received $60,000 from the $200,000 LNB loan and $25,000 from the $100,000 LNB loan. Thus, Lowe applied these proceeds to their intended purpose and, in an accounting would have received credit for having done so. Further, McClung received the Inlet Drive in equitable distribution. Hence, the loss should be reduced by $85,000, the amount which the record reflects was paid to the builder and which is therefore reflected in the value of the property which McClung received in the distribution.

Taking into account the demonstrated misapplication of separate funds and the burden which Lowe would have had in an action for accounting, McClung has discharged her burden to prove that, in an accounting, she would have been entitled to $211,677.43 [10] from Lowe by virtue of breach of fiduciary duty in connection with the LNB loans and

---

9. The balance of the LNB loans were satisfied by payment of $50,000 by Lowe's law firm and by $145,634.53 which came from the equity in the sale of the Blue Ridge Road house. McClung understood that the equity in the Blue Ridge Road house was to be applied to the purchase of the Inlet Drive house. Therefore, she agreed to that use of her marital property and it would not be subject to an accounting. McClung did not agree to the payment by the law firm, however, she has made no claim to any part of this payment.

10. This is the sum of $104,572.88, $8,750.00 and $98,354.55 ($183,354.55—$85,000).

the Inlet Drive transactions. Hence, she has carried the burden of proof on the damage issue in this component of her malpractice claim.

## II

### SMITH'S REPRESENTATION OF McCLUNG IN THE DIVORCE PROCEEDINGS

Following the separation on March 26, 1989, the relationship between Lowe and McClung continued to worsen and, in November 1989, Lowe instituted divorce proceedings. McClung retained Smith to represent her in those proceedings. Smith's representation of McClung in the divorce proceedings prompted several allegations of malpractice all of which were either admitted or proved by a preponderance of the evidence.

#### Failure To Respond To Requests For Admissions

■ It is undisputed that Smith neglected to file timely responses to the First and Second Requests for Admissions filed by Lowe. Although the First Requests would have been admitted, the record shows that McClung had provided information which would have permitted substantive denials of each admission sought by the Second Request (PEx. 20; PEx. 190; Smith Dep., p. 23; Tr. pp. 320–23). Smith's post-trial brief admits that this was malpractice.

As a result of Smith's neglect, McClung was unable, as a matter of law, to challenge the propositions asserted in the admissions. That meant that she was:

(1) Unable to contest that Lowe contributed more than half of all funds that were spent on the acquisition of the Inlet Drive property;

(2) Unable to contest that Lowe contributed more than half of the funds spent on improving the Blue Ridge house during the marriage;

(3) Unable to argue that Lowe had engaged in conduct which amounted to constructive desertion, cruelty, adultery, actual desertion or any other fault, which under the law would have permitted McClung to obtain a divorce; and

(4) Unable to argue that Lowe had misappropriated or misapplied any of McClung's separate funds.

Without question this admitted professional defalcation by Smith handicapped in a material way McClung's ability to deal with the divorce action and the ultimate disposition of the property in the equitable distribution proceedings.[11]

#### Failure To Investigate Lowe's Alleged Infidelity

McClung reported to Smith that she had reason to believe that Lowe had committed adultery. Smith admits that he did not investigate the information he received from McClung. (Tr. 359; PEx. 190; Smith Dep., p. 44). However, the record here fails to establish that reasonable inquiry would have enabled McClung to prevail on this issue.

#### Failure To Conduct Discovery

■ Smith did not file formal discovery until so late in the proceedings that the state court excused Lowe from any obligation to respond to it. (Tr. 446–47; PEx. 56). Smith's post-trial brief admits that this was malpractice. And, of course, it was.

Smith's failure to conduct discovery left him wholly unable to address the issues raised by Lowe at the equitable distribution hearings, precluded any meaningful impeachment of Lowe who was highly susceptible to impeachment, precluded Smith from assessing the value of Lowe's law practice, and kept Smith from understanding the significance of evidence in his possession. All of this rendered Smith's representation of McClung utterly ineffective and caused McClung actual damage.

■ At trial, Smith sought to explain away this fundamental failure of duty by

11. The Answer and Cross–Bill filed in the divorce proceedings contains all of these assertions and there was evidence to support each of them. McClung may not have prevailed on all of them, but the inability to pursue them at trial precluded consideration of any of these points. That inability is itself a form of damage because it deprived McClung of information that would have been useful in the divorce proceedings and in negotiating a settlement.

claiming that he had relied on informal discovery. Without doubt, there are instances when it is professionally acceptable to rely on informal discovery rather than to institute formal discovery. However, for several reasons, this was not one of them.

First, Smith told McClung in July 1990 that he was going to take Lowe's deposition (DEx. 13). Second, at trial, Smith was not able to identify the informal discovery which he had pursued, except to say that he reviewed financial records in Lowe's law office. Nor could Smith explain how the results obtained in informal discovery, whatever that may have been, justified failure to proceed formally. In fact, the indelible impression left by Smith's trial testimony on this point was that he was not telling the truth. That impression was confirmed by the post-trial affidavit of Lowe's secretary which shows that Smith never examined financial records of any sort in Lowe's law office (Wangensteen Aff., ¶¶ 5–8).

Finally, it was obvious from the obstinate, irrational, conflicting and contentious positions being taken by Lowe that informal discovery would not adequately protect McClung's interests. (PEx. 1–82; PEx. 100–110).

### Failure To Value Lowe's Law Practice As A Marital Asset

█ In December 1987, when he applied for the NCNB line of credit, Lowe represented that his law practice had a value of $150,000. (PEx. 132). In the divorce proceedings, Lowe took the position that the law firm had a negative value of $250,000. Smith never explored the issue by formal discovery or otherwise. Nor did Smith seek expert assistance in valuing this asset. Instead, he simply accepted Lowe's view that the law firm had a negative value. As a result, Smith offered no evidence at the equitable distribution hearings of the value of Lowe's law practice. McClung's expert, Donald

Lemons, established that this was malpractice.

It appears that, at the time of the divorce proceedings, Smith did not understand that the law practice could be a marital asset. For example, Smith never introduced evidence of McClung's contributions to the law practice and the guarantees she had provided for its debts. Nor did Smith list as an appeal point, the state court's error in concluding that the law firm was not marital property. At deposition in this case, Smith conceded that, in 1990, there was support in the decisional law, for the proposition that Lowe's law practice was marital property.

The record at trial established that, as of December 31, 1989, the law practice had a fair market value of $152,000. (PEx. 170). Louis C. Einwick, Jr., an expert in valuing professional corporations and associations, such as law firms, testified that the so-called "hard assets" had a value of $152,000 [12] and a goodwill value of $36,000. The record does not support a goodwill value, but it does permit a finding that the "hard asset" value was $152,000 as of December 31, 1989.

At the trial of this action, Smith and the law firm offered no evidence of the law firm's value. Instead, they defended that issue principally on the theory that McClung's evidence was insufficient to carry her burden because the valuation date was March 26, 1989 and that there was no evidence of value on that date.[13] This, they say, precludes a recovery on this issue.

The argument ignores the fact that Lowe himself valued the law practice at $150,000 in December 1987. Nor does it take into account that the record fails to show the value of the law firm was materially different in March 1989 than it was in December 1989. Taken as a whole, the preponderance of the evidence supports McClung's position, as explained by Einwick, that the "hard assets" of the law firm should have been, and but for Smith's neglect would have been, valued at

---

12. "Hard assets" are furniture, equipment, supplies, cash and accounts receivable. Einwick originally valued the hard assets at $171,000 but had to deduct an account receivable of $19,000 that was solely owned by Lowe's partner.

13. They also argue that the debt from the "Garwood case" substantially reduced the value of the law firm. The preponderance of the evidence and Einwick's report establishes that by 1989 the so-called "Garwood debt" did not have that impact.

$152,000 in the equitable distribution proceedings.

### Failure To Prepare For, Or Perform Adequately During, The Equitable Distribution Hearing

Smith's failure to conduct discovery, his failure to investigate the facts, his failure to appreciate the significance of the information and documents in his possession and his failure to prepare affected adversely his ability to represent McClung in the equitable distribution hearings. Those proceedings were in two installments, one on September 27, 1990 for the purpose of classifying property; the other on November 16, 1990 for the purpose of valuing the Inlet Drive house. Smith's performance on each occasion was abysmal. And, in each instance, Smith's incompetence cost McClung dearly.

 First, Smith failed to arrange for the services of a court reporter at the September hearing. Smith and the law firm correctly contend that the standard of care does not always require retention of a court reporter. However, it is not acceptable professional conduct to neglect to provide for a record in a bitterly contested divorce case, where, as here, the adverse spouse is contentious and asserting irrational positions, there are funds to provide for a transcript of trial proceedings and there is the reasonable likelihood of an appeal.

 Second, Smith failed to prepare McClung for the September hearing.[14] McClung testified that, although Smith met with her shortly before the hearing, he did not brief her on what to expect. Nor did he review with her the topics about which she was to testify. That is malpractice.

Apparently, the state court judge refused to allow testimony in the traditional form, requiring narrative summary testimony instead. It may lie within the discretion of a state court judge to require presentation of the evidence in that form, but the ability of a client to present the facts in such a circumstance requires at least as much preparation as does a traditional examination. McClung was prepared for neither and, according to

her testimony in this case, she was unable to relate her side of the issues in the divorce cases. Smith unconvincingly asserted that his preparation of McClung was greater than she claims, but he was unable to recite any particulars to support his version of that issue.

 The briefs filed in the improperly perfected appeal establish that the state trial judge also refused to permit cross-examination of witnesses after they rendered their narrative summaries. Apparently, Smith objected to this deprivation which, of course, does not lie within the discretion of any court. This error would have required reversal, but Smith's failure to perfect an appeal deprived McClung of the ability to secure that result.

Lowe described Smith as "befuddled" at the September equitable distribution hearing. According to Lowe:

> Mr. Smith did not probe at all, he did not ask, he did not seem prepared to inquire about financial matters, about the value of my law firm, about value of the property, source or derivation of funds, questions that would lead to a proper basis for an award of lump sum spousal support or periodic spousal support.

(PEx. 189, part 1, pp. 12–13).

The purpose of the November hearing was to determine the value to be placed on the Inlet Drive house for equitable distribution. Smith's performance at that hearing also was inadequate and was extremely damaging to McClung.

 Smith arranged for an appraisal and offered the testimony of an expert that the value was $360,000. However, Smith took no discovery of Lowe's expert or Lowe on this issue, even though, from the text of a letter sent by Lowe to the state court judge on September 30, 1990 (PEx. 111) and from correspondence between Lowe and Smith in October (PEx. 112; PEx. 113), Smith knew that Lowe intended to claim a much higher value. At the November hearing, Lowe of-

---

**14.** The absence of a transcript necessarily requires reliance on testimony and court records to ascertain what actually occurred at the September hearing.

fered an appraisal by Hockenyos Appraisal Service setting the value at $740,000.

However, because Smith had never examined the records respecting the purchase and financing of the Inlet Drive house, he was unprepared and, as a result, was unable to show that on January 13, 1988, Hockenyos had appraised the Inlet Drive house for First Southern and had established the value at $430,000 (PEx. 136; PEx. 190; Tr. 231–33, 431–33, 434–39; Smith Dep., pp. 77–78).[15] Smith clearly could have ascertained the existence of the previous Hockenyos appraisal either by reviewing the files respecting the permanent financing or by conducting discovery. Smith inexcusably did neither.

Nor did Smith offer into evidence a letter written to him by Lowe on September 14, 1989, in which he, as an owner of the property who is competent to testify as to value under Virginia law, represented that the value of the Inlet Drive property was $450,000. (PEx. 101; PEx. 190; Smith Dep., p. 73). The same letter reflected Lowe's view that "[n]o one in their right mind thinks that the house is worth anything like $800,000." (PEx. 101).

Finally, during the hearing Lowe made an offer to purchase the Inlet Drive house for $700,000, representing that a group of investors would back his offer when the state trial judge questioned whether Lowe had the wherewithal to perform. Notwithstanding that lead and the earlier letter to the judge on September 30 wherein Lowe claimed to be penniless, Smith was not able to cross-examine Lowe to determine whether the investor group even existed (Tr. 232–34) (which, from the limited record available here, it likely did not). The extent of Smith's ineptitude is exemplified by the fact that he was surprised by this development, notwithstanding that correspondence between him and Lowe in October, 1990 (PEx. 112; PEx. 113) made reference to an investor group and advanced a tentative offer of $700,000 which Smith

countered with a demand of $800,000. (PEx. 113).

In sum, Smith's performance in the November hearing was completely inept. His abject failure in representing McClung permitted the state court judge to enter an order setting the value of the Inlet Drive house at $675,000, determining that the equity was $377,000 and entering a judgment against McClung in the amount of $188,500, one-half of the equity. The record may have permitted that result, but the truth did not. This unjust result was wrought by Smith's failure to investigate, failure to take discovery, failure to prepare for the hearing, and failure to use information in his possession or otherwise readily available.

### Smith's Failure To Seek Interim Spousal Support

 McClung informed Smith that she needed financial support while the divorce proceedings were pending. Smith, however, failed to request interim spousal support. This, according to McClung's expert witness, Donald Lemons, was negligence.

Smith contends that a hearing for pendente lite support was held, but that the request was denied. The record does not support that assertion.

McClung testified that Smith never mentioned such a hearing to her. The state court record does not contain a petition for interim support on McClung's behalf. Smith could not recall whether he offered evidence of McClung's need for support or whether McClung was given notice of the hearing. Smith's time records contain no entries reflecting preparation for, or participation in, such a hearing. Nor does the state court record reflect an order denying an application for interim spousal support. Considering these facts and Smith's demeanor while testifying, the court declines to credit Smith's version of events and finds that there was no

---

15. The record indicates that the construction cost for the Inlet Drive house may have been slightly more than $600,000. The cost of construction apparently was increased because of changes and other factors that would not be reflected in market value. The Hockenyos ap- praisal for First Southern Mortgage was made at the end of construction and updated at closing which meant that the cost of construction would have been available to Hockenyos as the appraisal was updated.

application for, or hearing on, temporary support.[16]

The period between separation and divorce was 14 months. During that period, McClung was required to pay the mortgage payment on the Emerald Isle house in the amount of $2,000 a month, which she paid out of her separate income and borrowings from her relatives. As a consequence, McClung sustained a loss of $28,000. And, she was required to borrow $50,000 to avoid foreclosure during the pendency of the divorce proceedings.

### Failure To Perfect An Appeal

 It is undisputed that Smith failed to perfect the appeal he initiated on McClung's behalf and that, as a result, the appeal was dismissed. Smith's performance throughout the equitable distribution proceedings was so inept that an appeal may not have succeeded but for the state court judge's refusal to allow cross-examination. That is such a fundamental deprivation of a right, with such far reaching consequences, that it would have required reversal and rehearing. Although, Smith preserved this point for appeal, his admitted malpractice in failing to perfect the appeal forfeited the opportunity to take advantage of it.

In sum, Smith's performance as a lawyer in the divorce and dissolution proceedings was completely inadequate. McClung could have done no worse in those proceedings if she had been unrepresented. In fact, because of Smith's incompetence, she was unrepresented for all practical and legal purposes.

### The Consequences Of The Malpractice

 Smith's malpractice pervaded every aspect of the divorce proceedings and, as a result, McClung suffered an adverse judgment in the amount of $188,500, was deprived of interim spousal support and attorney's fees and paid the law firm legal fees which, for all practical purposes, were wasted.

If McClung had been competently represented in the equitable distribution proceedings, the total marital estate would have been valued as follows:

| | | |
|---|---|---|
| Inlet Drive house | $450,000 | |
| Law Firm | 152,000 | |
| Personal Property | 50,000 | (undisputed) |
| Total Gross Marital Estate | $652,000 | |
| Less Marital Debt | 298,000 | (the amount owed on the Inlet Drive house) |
| Net Marital Estate | $354,000 | |

Assuming, as both experts testified, that the state court judge would have divided the property equally, each party would have been entitled to receive property or cash in an amount of $177,000.

McClung was in possession of the Inlet Drive house which had a net equity of $152,000 and she was in possession of one-half of the personal property was worth $25,000. Lowe was in possession of his law firm which also had a net value of $152,000 and one-half of the personal property, worth $25,000. Thus, it would have been unnecessary to make a monetary award to either McClung or Lowe to achieve equitable distribution under the equal allocation formula determined by the state court judge, an allocation challenged by neither McClung or Smith. Instead, because of Smith's malpractice, a judgment was entered against McClung in the amount of $188,500.

McClung would have been entitled to interim spousal support of $28,000. As a result of Smith's malpractice, she received nothing. Moreover, she was required to borrow $50,000 to avoid foreclosure. Interim support would have permitted her to incur one-half of that obligation. Thus, the damages for this act of malpractice should be increased by $25,000 for a total of $53,000.

Finally, McClung paid the law firm $16,020 in attorney's fees. McClung is entitled to a refund of all of the attorney's fees because the representation she received from Smith was wholly inadequate. It would be unconscionable to permit the law firm to retain any

16. Smith's own account of this supposed hearing, even if credited, would not alter the conclusion that his representation of McClung on this issue was inadequate. Smith says that the hearing was conducted only on the basis of state-

ments of the financial condition of the parties. Considering the testimony of both experts and the record, McClung's side of this issue could not have been presented adequately on such a limited basis.

of the funds McClung paid for such grossly inadequate representation.

In sum, Smith's malpractice in the dissolution action resulted in damages to McClung in the amount of $257,520.

Smith argues that the decision of the Supreme Court of Virginia in *Allied Products v. Duesterdick*, 217 Va. 763, 232 S.E.2d 774 (1977) precludes McClung from claiming damage from the $188,000 judgment against her because she has not discharged that judgment. *Duesterdick* does not apply here. First, McClung actually made a partial payment to Lowe of $60,000. (PEx. 187; PEx. 188). Second, Lowe has recorded the judgment, placed a lien against McClung's property and she was able to forestall foreclosure only upon payment of $60,000 and an agreement that he will receive first dollar out of any proceeds in this action. *Id.* For these reasons, *Duesterdick* does not apply here.

### III

### TOTAL DAMAGES AND INTEREST

As explained in section I, McClung suffered damages in the amount of $211,677.43 as a consequence of Smith's malpractice in failing to institute an accounting. As a consequence of Smith's malpractice in the dissolution action, McClung suffered damages in the amount of $257,520. Her total damages, therefore, are $469,197.43.

▮▮▮ McClung claims entitlement to prejudgment interest at the rate of 8% for the period March 1, 1989 through July 31, 1991 and at 9% thereafter. McClung's claim for prejudgment interest is based on Va.Code Ann. § 8.01–382 which provides that, in an action at law or a suit in equity, a jury, or court sitting without a jury "may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Prejudgment interest is not an element of damages, but, instead, is a statutory award for the delay in the payment of money due, *Nationwide Mut. Ins. Co. v. Finley*, 215 Va. 700, 214 S.E.2d 129 (1975), or compensation for the loss of use of money. *Marks v. Sanzo*, 231 Va. 350, 345 S.E.2d 263 (1986).

▮▮▮ State law controls entitlement to prejudgment interest in diversity cases and the determination of the rate of prejudgment interest is generally a matter entrusted to the discretion of the district court, *United States v. Dollar–Rent–A–Car Systems, Inc.*, 712 F.2d 938 (4th Cir.1983). However, that discretion is circumscribed by the legal interest rate proscribed by state law. *J.W. Creech, Inc. v. Norfolk Air Conditioning Corp.*, 237 Va. 320, 377 S.E.2d 605 (1989). An award of interest is permissible, even if the claim is unliquidated, *Beale v. King*, 204 Va. 443, 132 S.E.2d 476 (1963), so long as there is a rational basis in the evidence upon which to fix the date when interest should begin to run. Nor, contrary to the defendant's argument, is there an exception in the language of the statute placing beyond its reach cases in which there exist bona fide legal disputes. *Gill v. Rollins Protective Services Co.*, 836 F.2d 194 (4th Cir.1987).

Applying these principles to the factual record in this action, it is not appropriate to award prejudgment interest for the periods, or at the rates, requested by McClung. The record, however, supplies sufficient information on which to calculate appropriate prejudgment interest.

▮▮▮ First, the court concludes that interest ought to be calculated from January 1, 1991. The record establishes that the equitable distribution proceedings were concluded on November 16, 1990 and that the final decree was tendered to the state court judge on November 30, 1990. It is probable that any accounting proceedings initiated by McClung would have been resolved in tandem with the equitable distribution proceedings once Lowe had filed for divorce. Thus, it is likely that those proceedings, whether conducted separately or upon consolidation, would have been concluded at the same time as the dissolution proceedings to avoid the prospect of inconsistent judgments or an unfair result to either party. The judgment would have become final twenty-one days after entry. Allowing time for reflection following delivery of the order November 30, 1990 and considering the holiday schedule, it is appropriate to fix January 1, 1991 as the

date upon which prejudgment interest should begin to accrue.

For all of that period until now, the prime interest rate has been less than the judgment rate permitted by Virginia law. Considering the underlying purposes of the prejudgment interest contemplated by Va Code Ann. § 8.01–382, it seems reasonable to establish the average prime interest rate in each year from 1991 to date as the appropriate rate for the calculation of interest. That rate was: 8.46% in 1991; 6.25% in 1992; 6.00% in 1993 and 7.02% through December 20, 1994.[17]

## CONCLUSION

For the foregoing reasons, McClung is entitled to judgment in her favor in the amount of $469,197.43 in damages and $129,171.64 in prejudgment interest, a total of $598,369.07. Judgment shall be entered in McClung's favor in that amount and post-judgment interest thereon shall run at the statutory rate from December 21, 1994 until the judgment is paid.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

17. Federal Reserve Bulletin, Financial Markets, § 1.33 PRIME RATE CHARGED BY BANKS, Short–Term Business Loans, November 1994. This bulletin is in the file. The prejudgment interest for 1991, 1992 and 1993 is $39,694.10, $29,324.84 and $28,155.85, respectively. From January 1 through November 30, 1994 and for December 1 through 20, 1994, the prejudgment is $30,192.85 and $1,804.00, respectively.